**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 98-30875

---

STEVEN HENRY ADAMS, for Himself and as Representative of Certain Underwriters at Lloyd's; INDEMNITY MARINE ASSURANCE COMPANY LTD; THE YORKSHIRE INSURANCE COMPANY LIMITED; COMMERCIAL UNION ASSURANCE COMPANY PLC; PHOENIX ASSURANCE PLC; CORNHILL INSURANCE PLC; NORWICH UNION FIRE INSURANCE SOCIETY LTD; MARITIME INSURANCE COMPANY LTD; THE NORTHERN ASSURANCE CO, LTD; SKANDIA UK INSURANCE PLC; OCEAN MARINE INSURANCE COMPANY; FOLKSAM INTERNATIONAL INSURANCE COMPANY (U.K.) LTD; SCOTTISH LION INSURANCE COMPANY LTD; WURTTEMBERGISCHE FEUERVERSICHERUNG AG; SPHERE DRAKE INSURANCE PLC; DAI-TOKYO INSURANCE COMPANY (U.K.) LTD

Plaintiffs - Appellees - Appellants - Cross Appellants - Cross Appellees

VERSUS

UNIONE MEDITERRANEA DI SICURTA; ET AL

Defendants

AMERICAN EAGLE MARINE, INC

Defendant - Appellee - Appellant - Cross Appellant - Cross Appellee

VERSUS

AK STEEL CORPORATION, formerly know as, Armco Steel Company, L P

Defendant - Appellee - Cross Appellant

UMS GENERALI MARINE S.P.A., formerly known as Union Mediterranea Di Sicurta'

                        Defendant - Appellant - Cross Appellee


                        VERSUS


                        BRITAMCO UNDERWRITERS, INC


                        Defendant - Appellee - Appellant -
                        Cross Appellant - Cross Appellee

---

Appeals from the United States District Court
For the Eastern District of Louisiana

August 14, 2000

Before JONES, DUHÉ, and WIENER, Circuit Judges.

DUHÉ, Circuit Judge:

This appeal involves two causes of action arising out of the sinking of a cargo of 158 steel slabs in the Mississippi River. The first cause of action is a dispute between two insurers of the cargo, Steve Henry Adams, et. al. ("the Plaintiffs") and U.M.S. Generali Marine S.P.A. ("UMS"), over whether the non-paying co-insurer (UMS) should be required to contribute to the payment of loss.  The second action is a claim by the Plaintiffs for conversion of the cargo against a voluntary salvor, American Eagle Marine, Inc. ("American Eagle"), and the subsequent purchaser of

the salvaged cargo, A.K. Steel Corp. ("A.K. Steel").

Regarding the dispute between the insurers, we conclude that UMS did not waive its personal jurisdiction defense, and we reverse and remand for the district court to determine jurisdiction. We do not decide the other issues UMS and the Plaintiffs raise on appeal against each other. As to the conversion dispute, we affirm on all grounds except one. We reverse and vacate the district court's determination that American Eagle's general liability insurance policy with Britamco Underwriters, Inc. ("Britamco") provided coverage for American Eagle's negligent conversion. We do not decide whether UMS may subrogate against American Eagle and A.K. Steel.

**BACKGROUND**

I.   Factual Background

While en route from New Orleans to Cincinnati, Canal Barge Company ("Canal Barge") barges CBX 207 and 214 sank in the Mississippi River. This case involves a dispute over the 158 slabs of steel cargo carried to the riverbed aboard those two barges. A.K. Steel of Middletown, Ohio, had originally agreed to purchase the steel slabs from Duferco, S.A ("Duferco"), a Swiss Company.

The Plaintiffs and UMS concurrently insured the cargo under open marine cargo policies. Duferco had an open cargo policy with UMS, an Italian insurance company, which was written and issued in Italy and delivered to Duferco in Switzerland. Canal Barge had an

3

open cargo/shippers' interest insurance policy with the Plaintiffs, on which Duferco was named as an additional insured.

After the accident, Duferco made a claim with UMS. Duferco, through its agent, the Italian Claims Agency ("ICA"), awarded a salvage contract to American Eagle to raise the cargo. The contract provided that it could be canceled with notice and that American Eagle did not have to perform salvage until the river gauge at Vicksburg fell below 20 feet, the depth at which salvage could be prudently performed. UMS advanced to Duferco $191,000 in sue-and-labor costs for the salvage effort. In March 1994, UMS denied the claim primarily because Duferco failed to warrant proper loading of the cargo. In the meantime, A.K. Steel (the original intended purchaser) confirmed that it did not own the cargo and assigned any and all of its rights to Duferco.

The salvage contract remained in effect until July 6, 1994, when ICA wrote American Eagle advising that Duferco was canceling the contract. In the letter, an ICA representative wrote that the cargo "had been abandoned." The parties greatly dispute the meaning of this letter and the circumstances surrounding it. From July 6, 1994 until it mobilized its voluntary effort near the end of January 1995, American Eagle did not salvage the steel, although the river gauges suggested that the months of September, October and November of 1994, presented optimum times for salvage because of the low water depths. On February 18, 1995, with the river gauge just below the minimum depth for prudent operations, American

4

Eagle voluntarily undertook salvage of the steel.

American Eagle did not negotiate with potential buyers for the steel before commencing the salvage operation. While it made some attempt to discover the chemical composition of the steel, it abandoned those efforts, thereby lowering the potential market value for the steel. American Eagle first contacted A.K. Steel on January 7, 1995. A.K. Steel offered to purchase what it described as the "Duferco Steel, that had sunk in the Mississippi." American Eagle was unaware that A.K. Steel was the original intended purchaser of the steel. A.K. Steel did not advise the Plaintiffs or other interested parties of its negotiations with American Eagle to purchase the steel.

In negotiations, American Eagle refused to warrant title to the steel as insisted by A.K. Steel. During the salvage operation, American Eagle also refused to sell the steel to another buyer because this purchaser demanded that American Eagle warrant title. Instead, it would only warrant abandonment for salvage, a demand to which A.K. Steel eventually acceded. On March 8, 1995, American Eagle sold all its rights in the cargo retrieved to A.K. Steel. In the purchase agreement, American Eagle sold to A.K. Steel its "rights, and possession in salvage and title rights, if any."

Salvage operations commenced on February 21, 1995, and continued through April 26, 1995. American Eagle successfully salvaged 127 steel slabs, relinquishing them to A.K. Steel as they were placed aboard barges in the river. Pursuant to their

5

contract, A.K. Steel paid American Eagle $525,424.32. The Plaintiffs did not assert an ownership interest in the steel until after the salvage operation was completed.

The Plaintiffs were made aware of the salvage operation in April 1995 by Canal Barge's counsel, who advised Plaintiffs' counsel that Douglas Adams of American Eagle had inquired about salvaging the cargo. When the Plaintiffs advised American Eagle and A.K. Steel that the cargo was theirs and that the salvage should cease, they both refused. American Eagle and A.K. Steel initially argued that they owned the steel. Later American Eagle and A.K. Steel asserted defenses based on the laws of salvage.

II. Procedural History

The Plaintiffs brought this case originally as an action for declaratory relief to ascertain the proper party to pay the constructive total loss of cargo under the insurance policy they issued to Canal Barge. They also sought to determined whether UMS, which also issued Duferco a similar policy insuring the same cargo, was obligated to contribute to the payment. Plaintiffs named as defendants Ilva, the manufacturer of the steel; Duferco; Canal Barge; UMS; and Duferco Steel, Inc., an American sister company to Duferco. The court voluntarily dismissed Ilva, Duferco, Duferco Steel, Inc., Canal Barge and A.K. Steel from this initial action at various times. The Plaintiffs later made A.K. Steel a co-defendant in the action for conversion of the steel.

In the initial declaratory relief action, the district court

6

held that Duferco was entitled to recover its loss from either Plaintiffs or UMS. Since Duferco made demands on the Plaintiffs first, the Plaintiffs were obliged to pay Duferco before seeking contribution from UMS. Pursuant to this ruling, the Plaintiffs paid Duferco $986,352.41 in exchange for an assignment of Duferco's rights, if any, against UMS. Plaintiffs refused Duferco's claim for payment of approximately $191,000 in sue and labor expenses (specifically, investigation expenses, survey costs, and attorney's fees) advanced by UMS during the preliminary loss investigation. The district court voluntarily dismissed A.K. Steel, which had relinquished any claim it may have had, from the suit prior to payment of the Duferco claim.

The Plaintiffs then discovered the salvage effort and demanded that American Eagle and A.K. Steel return the cargo or pay its value. When American Eagle and A.K. Steel refused, the Plaintiffs filed an amended declaratory judgment action, which asserted a claim to recover the value of the steel from American Eagle and A.K. Steel. UMS then filed a cross-claim against A.K. Steel and American Eagle.

At trial on the amended declaratory action, it was determined that although UMS had initially agreed to pay Duferco's claim, UMS denied coverage after learning Canal Barge had additional coverage. The district court rejected every coverage defense raised by UMS.[1]

---

[1] The district court earlier had granted the Plaintiffs' motion to compel substitution of real party in interest. This motion

7

In rejecting these defenses, the district court found that UMS was obliged under its policy with Duferco to contribute to the loss in proportion to the amount its coverage bore to the total amount of insurance (80 percent of the loss). The district court awarded the Plaintiffs $789,081.93 against UMS or 80 percent of $986,352.41.

In the conversion action, the district court found that American Eagle and A.K. Steel had, albeit in good faith, negligently converted the steel.[2]  The court held that the Plaintiffs had not abandoned the cargo.  The court awarded $190,975.68 for the conversion, which it divided on an eighty-twenty basis between UMS ($152,780.55) and Plaintiffs ($38,195.13). The district court entered judgment against American Eagle and A.K. Steel in favor of UMS and the Plaintiffs for these amounts. Finally, the court held that American Eagle's liability for negligent conversion was covered by its general liability insurance policy with Britamco.[3]

In calculating the judgment, the district court determined that the cargo's value, after applying a 20 percent discount based

---

requested the district court to make UMS an involuntary Plaintiff in Duferco's cross-claim against Canal Barge.

[2]  The district court and the parties treat both American Eagle and A.K. Steel as salvors.  For this reason, we likewise do so in certain portions of our opinion.

[3]  During the course of this litigation, American Eagle filed for bankruptcy.  The court then ordered an automatic stay.  The court lifted the stay and substituted Britamco as the real party in interest.

on the unavailability of the steel's chemistries to Plaintiffs, was $716,400.[4] The court then offset the value of the sunken steel by $525,424.32, American Eagle's salvage expenses. The district court held that American Eagle's and A.K. Steel's right to assert a salvage claim against the Plaintiffs had lapsed with the passage of the two-year prescriptive period, but the right could nonetheless be asserted as an affirmative defense. The $190,975.68 is then the difference between the discounted value of the cargo and the salvage expense.

No party is happy with the district court rulings. On appeal, UMS has dropped all coverage defenses. UMS appeals the district court rulings concerning personal jurisdiction over it, venue, and the allocation of the loss between insurers. The Plaintiffs contend that UMS should be barred from receiving any money judgment from A.K. Steel and American Eagle until it pays them its pro-rata share of the constructive loss. Plaintiffs also argue that the district court abused its discretion in not allowing them to recover attorney's fees and expenses from UMS.

Regarding the conversion litigation, American Eagle and A.K. Steel appeal the district court's finding of negligent conversion, arguing that the cargo was abandoned. American Eagle also appeals the district court's ruling on negligent conversion, arguing that

---

[4] The district court reached this amount by reducing the per net ton of the steel from $300 to $240 and then presumably multiplying that figure by the tonnage of the salvaged steel.

it only transferred its possessory interest and salvage claim to A.K. Steel.  In addition, A.K. Steel appeals the district court's holdings that it was not protected by the voidable title doctrine, that UMS could subrogate against it, and the court's exercise of subject matter jurisdiction.  Plaintiffs cross-appeal the district court's ruling that American Eagle and A.K. Steel could assert the right to a salvage claim as an affirmative defense, its ruling that they acted in good faith, and its calculating the steel's value and the salvage award.  Finally, American Eagle's insurer, Britamco, alleges that the district court erred in concluding that its policy covered American Eagle's negligent conversion.

## DISCUSSION

I.   Personal Jurisdiction over UMS

We review de novo the district court's determination that its exercise of personal jurisdiction over a non-resident defendant is proper when the relevant facts are not in dispute.  Wilson v. Belin, 20 F.3d 644, 647-48 (5th Cir. 1994).  When a nonresident defendant timely questions a federal district court's jurisdiction over it, the plaintiff bears the burden of establishing jurisdiction.  Id. at 648; Travelers Indem. Co. v. Calvert Fire Ins. Co., 798 F.2d 826, 831 (5th Cir. 1986).  In determining personal jurisdiction, a court is not restricted to a review of the plaintiff's pleadings.  It may resolve a jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any recognized form

of discovery. <u>Jobe v. ATR Marketing, Inc.</u>, 87 F.3d 751, 753 (5th Cir. 1996).

In admiralty cases, a federal court may exercise personal jurisdiction over a foreign defendant, such as UMS, when (1) Louisiana could have acquired personal jurisdiction over the defendant on the same cause of action; and (2) the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. <u>Asarco, Inc. v. Glenara, Ltd.</u>, 912 F.2d 784, 786 (5th Cir. 1990). In this case, these two inquiries merge into one because Louisiana's long-arm statute permits jurisdiction coterminous with the scope of the Due Process Clause. <u>Id</u>. See La. Rev. Stat. Ann. § 13:3201 (West 1991).

Additionally, a defendant may waive its personal jurisdiction defense, thereby consenting to jurisdiction. <u>See</u> <u>Travelers Indem. Co.</u>, 798 F.2d at 834. ("Clearly parties can waive lack of personal jurisdiction."). Usually a party waives personal jurisdiction by failing to raise the issue when filing a responsive pleading or making a general appearance. Fed R. Civ. P. 12(h). In rarer circumstances, a defendant may waive personal jurisdiction if it authorized another to appear or act on its behalf in court. <u>Reynolds v. International Amateur Athletic Fed'n</u>, 23 F.3d 1110, 1121 (6th Cir. 1994)(citing <u>Federal Deposit Ins. Corp. v. Oaklawn Apts</u>., 959 F.2d 170, 175 (10th Cir. 1992)).

The district court concluded that UMS waived personal

11

jurisdiction because it authorized Duferco to appear on its behalf.[5]
The court first determined that the legal representations of UMS and
Duferco were intimately intertwined. The court examined Statements
for Professional Services Rendered submitted by various law firms
involved in this litigation. The court found that those documents
indicated that at the time Duferco filed its answer to the
Plaintiffs' complaint, the same attorneys represented UMS and
Duferco. In addition, UMS paid Duferco's legal bills during 1994
and 1995; and a law firm representing Duferco had represented UMS
on other occasions.

The Court also concluded that not only was the legal
representation intertwined, but the claims were as well:

> UMS' attempt to shield itself from the jurisdiction of this
> court by relying on Duferco's ostensible obligation to
> reimburse them is disingenuous, at best. Indeed, UMS
> continually argues that Duferco must reimburse them for the
> fees expended during the salvage attempt. However, Duferco
> has paid UMS nothing despite that the loss occurred over two
> years ago. Nor has the Court been given any proof that UMS
> has instituted suit against Duferco in Italy for this money.

The court found that UMS attempted to insulate itself from the
court's jurisdiction by hiding behind Duferco. "Duferco is truly
acting for UMS. Thus, this Court finds that UMS has waived its
personal jurisdiction defense through the actions of Duferco."
Citing Reynolds, 23 F.3d at 1121. Because of this finding, it was

---

[5] The court denied UMS' motion to dismiss for lack of
jurisdiction and later denied UMS' motion to reconsider and order
seeking certification pursuant to 28 U.S.C. § 1292(b). The court
denied UMS' motion to reconsider for the same reasons stated in its
earlier order.

unnecessary for the court to consider whether it had specific or general personal jurisdiction over UMS.

On appeal, UMS raises some legitimate questions regarding the district court's findings regarding the relationship between UMS and Duferco. As to the court's determination that UMS had not sought reimbursement for the sue-and-labor costs from Duferco for nearly two years, UMS contends that such action was not necessary because UMS already had a less formal but equally effective means to enforce Duferco's obligation to pay. A Duferco director testified in a deposition that on July 3, 1995 UMS entered a debit of $191,000 on Duferco's open account.[6] (R. at 3689-3691). This amount was subtracted from a total premium refund of $574,342, which was paid to Duferco when the accounting for the 1993-1994 policy year was completed. (See UMS Bench Book of Exhibits 16).

UMS also claims that the District Court misapplied Reynolds in holding that UMS authorized Duferco's actions. In Reynolds, the Sixth Circuit reversed the lower court's holding that the International Amateur Athletic Federation ("IAAF") had waived its jurisdictional defenses by reason of a Federation member's intervention in a lawsuit filed against the IAAF by a disgruntled athlete. The Sixth Circuit determined that the member was carrying out a statutory duty when it intervened, and noted that there was

---

[6] The Plaintiffs contend that this deposition only reinforces the district court conclusion. The director testified that he did not regard the expenses to be owed by Duferco. Instead, he expected full recovery of its losses and expenses from UMS.

13

no evidence indicating the IAAF authorized the member to do so. Reynolds, 23 F.3d at 1121. To some extent, this case is similar to Reynolds. Duferco had an obligation under Italian law to reimburse the expenses to UMS. Italian Civil Code, Article 2041 (Mario Betramo, et. al., trans.) (1991) ("General cause of action for unjust enrichment. A person who has enriched himself without cause at the expense of another shall, to the extent of the enrichment, indemnify the other for his correlative financial loss.")[7]

UMS makes a strong showing that it has been reimbursed, but we are still left with undisputed evidence that the legal representations of UMS and Duferco were intimately intertwined. UMS contends that even this evidence does not amount to consent to personal jurisdiction.

Cases dealing with this factual scenario are few and far between. Travelers Indem. Co., 798 F.2d at 832-35, involved a dispute over defendant insurer London Club's indemnity obligations arising from a maritime collision. In the suit, counsel selected by London Club had consented, on behalf of the shipowner, to transfer the case to Louisiana. The Plaintiffs argued that this consent amounted to a waiver of London Club's personal jurisdiction defenses in federal court in Louisiana. We held that the consent to transfer did not result in London Club's waiver of its personal

---

[7] Plaintiffs contend that this argument rings hollow in light of UMS' failure for nearly two years to attempt to recover the expenses from Duferco in an Italian forum.

14

jurisdiction defenses.  Id.

One federal district court has rejected the contention that a foreign defendant waives jurisdiction when it has a controlling interest in ongoing litigation in the United States.  Complaint of Kreta Shipping, S.A., No. 96 Civ. 1137, 1998 WL 173167 (S.D.N.Y. Jan. 29, 1998), arose out of the abandonment of the M/V AMPHION, which resulted in damage to a cargo of steel laden on board.  Kreta, the owner of the vessel, commenced a limitation action in federal court seeking exoneration from or limitation of liability with respect to losses connected with the AMPHION's voyage.

Kreta had hired Astron Maritime Company to provide management services for the vessel in accordance with a standard managing and agency agreement, which was signed and negotiated in Greece. Claimants in the limitation proceeding filed actions in federal court against Astron, which sought to dismiss these claims for lack of personal jurisdiction.  The claimants did not contend that any of the facts presented to the district court subjected Astron to personal jurisdiction.  Rather, they took the position that jurisdiction came from Astron's conduct in the Kreta Shipping litigation.  They specifically alleged that Astron, rather than Kreta, made the decision to file the limitation action and had "power over litigation conferred by the ship management contract." Id. at *3.

The district court rejected this theory and concluded that Astron did not consent to personal jurisdiction through its

15

involvement in the Kreta Shipping litigation.

> The fact that Astron may be the party ultimately liable and that Astron may have directed the decision-making behind this lawsuit does not result in Astron having consented to the Court's jurisdiction. These facts make Astron no different than the typical maritime (or other) insurer - an insurer will often be the party ultimately financially liable, may provide for the insured's legal representation and legal strategy, and often effectively controls the conduct of the lawsuit. Insurers do not, however, consent to personal jurisdiction through such activities (absent state "direct action" or similar insurance legislation).[8]

The district court's reasoning in Kreta Shipping is compelling; in particular the court's recognition that insurers often must take an active role in an insured's legal problems.[9] UMS has continually argued that it is accepted industry custom world-wide for an insurer to retain the same attorneys to act for itself and its insured when investigating loss. While UMS' actions may be somewhat suspect, the evidence does not support a finding that UMS has relied on these tactics to insulate itself from jurisdiction of the district court. The evidence equally supports a finding that UMS acted like any other insurer would when its insured faces legal liability. In

---

[8] Id. at *7 (internal citations omitted). The direct action statute in Louisiana is not a legislative assertion of jurisdiction over insurance companies. McKeithen v. M/T FROSTA, 435 F. Supp. 584, 586 n.6 (E.D. La. 1977).

[9] The Plaintiffs argue that the factual circumstances in Kreta Shipping are critically different from those in this case because the shipping agent in Kreta Shipping was not attempting to assert a cause of action for funds owed to the agent. Whereas, UMS was asserting its claim disguised as Duferco. The Plaintiffs, however, do not dispute the central holding of Kreta Shipping. Moreover, based on the analysis above, it is impossible to discern what motives, if any, UMS had as to the funds in question.

16

addition, our standard of review places the burden on the plaintiff, and not the defendant, to support finding personal jurisdiction. See also C. Wright & A. Miller, Federal Practice and Procedure § 3522 at 60 (1984) ("It is a principle of first importance that the federal courts are courts of limited jurisdiction.").

For these reasons, we conclude that UMS did not waive its personal jurisdiction defenses and we reverse the district court. Because of its decision on waiver, the district court did not decide whether it had specific or general jurisdiction over UMS.[10]  Since the parties dispute whether the district court has jurisdiction over UMS, we remand the case for a further determination of jurisdiction. Because jurisdiction over UMS is unresolved, we do not address the other issues the Plaintiffs and UMS raise on appeal: The Plaintiffs claim attempting to block UMS from receiving its money judgment and their claim seeking attorney's fees and expenses from UMS; and UMS claims of improper venue and improper allocation of loss between insurers.  We also do not address whether UMS may subrogate against American Eagle and A.K. Steel.

II.  Salvage and Title Dispute

A.  Abandonment of the Cargo

We review findings of fact for clear error and legal

---

[10]The parties submitted motions to the court addressing the personal jurisdiction/minimal contacts inquiry and the district court conducted a hearing, but ruled only on the waiver issue.

conclusions de novo. Ivy v. Jones, 192 F.3d 514, 516 (5th Cir. 1999). Under the clearly erroneous standard, we look first to whether there is substantial evidence supporting the findings. We will not set aside the district court's factual findings when they are supported by substantial evidence, unless, after a review of the record as a whole, we are left with the unyielding belief that a mistake has been made. Anderson v. Bessemer City, 470 U.S. 564, 573 (1985).

The district court held that the Plaintiffs had title to the salvaged steel. The court determined that the law of salvage applied to this case, rather than the law of finds. Therefore, A.K. Steel did not possess title to the salvaged steel, which it acquired from American Eagle. On appeal, American Eagle and A.K. Steel contend that title to the cargo was abandoned pursuant to the law of finds, therefore, American Eagle and subsequently A.K. Steel should be considered the rightful titleholders.

We review whether the sunken cargo comes within the law of salvage or the law of finds.[11] One commentator has noted that

---

[11] A.K. Steel argues that the trial court incorrectly determined that it had admiralty jurisdiction over the title issue and state law should apply because the steel slabs were abandoned and embedded in the river bed. It contends that this case does not come within the jurisdiction of federal courts under the Abandoned Shipwrecks Act. In California v. Deep Sea Research Inc., 118 S.Ct. 1464, 1473 (1998), the Supreme Court held that the Eleventh Amendment does not bar federal jurisdiction to adjudicate the status of a wreck under the Abandoned Shipwrecks Act, 43 U.S.C. §§ 2101-2106. In addition, the Abandoned Shipwrecks Act does not govern this case. As a rule, claims arising out of salvage operations are within the admiralty jurisdiction of federal courts.

18

"[t]here appears to be no clear line of demarcation between property that is 'salvaged' and 'finds.'" Frank L. Maraist, <u>Admiralty in a Nut Shell</u> 130 (West 3d ed. 1996). Generally speaking, "[m]arine salvage occurs when marine property is successfully saved by a volunteer from marine peril. By performing a voluntary and successful act, the salvor obtains a maritime lien on the salved property, which he can enforce in rem in an admiralty court." Martin J. Norris, <u>Benedict on Admiralty</u> § 802[A] at 8-4 (1998).

The owner of the distressed goods on navigable waters does not lose title even though the property may become the subject of salvage services. <u>Id</u>. § 150 at 11-1.[12] "The salvor obtains a right of possession; he does not acquire ownership or title to the salved property." <u>Id</u>. § 150 at 11-1 to 11-2. The maritime lien allows the salvor to secure compensation for his voluntary services. "All that the salvor can do is to enforce his lien by making his claim to an award. He thus has a lien and he has the right of possession. He also has the duty of properly caring for the property while it is in his possession." <u>Id</u>. at 11-2.

A find, on the other hand, differs from salvage in that the property has either been abandoned (as further defined below) or

---

<u>Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel</u>, 640 F.2d 560, 566 (5th Cir. 1981).

[12] "When articles are lost at sea the title of the owner in them remains, even if they are found floating on the surface or after being cast upon the shore. Should a vessel be abandoned without hope of recovery or return, the right of property still remains in her owner." <u>Benedict on Admiralty</u> § 150 at 11-1.

never owned by any person. The property belongs to the finder. Benedict on Admiralty notes:

> The common law of finds treats property that is abandoned as returned to the state of nature and thus equivalent to property, such as fish or ocean plants, with no prior owner. . . . Admiralty favors the law of salvage over the law of finds because salvage law's aims, assumptions, and rules are more consonant with the needs of maritime activity and because salvage law encourages less competitive and secretive forms of conduct than finds law. . . . [A] finding that title to such property has been lost requires strong proof, *such as the owner's express declaration abandoning title*." Id. § 158 at 11-16 (quoting Hener v United States, 525 F. Supp. 350 (S. D. N. Y. 1981) (emphasis added)).

Several courts favor salvage instead of finds, and have applied the law of finds only when supported by strong evidence. The Fifth Circuit has noted that even when a vessel is abandoned the original owner is not divested of title "except in extraordinary cases. . . where the property has been lost or abandoned for a very long period." Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel, 640 F.2d 560, 567 (5th Cir. 1981).

The more important question, however, is what must an owner do to affirmatively release title to the property - forever abandoning it under the law of finds. As the Fourth Circuit has noted there are only a handful of cases applying the law of finds. These cases fit into two categories. "First, there are cases where owners have expressly and publically abandoned their property. In the second type of case, items are recovered from ancient shipwrecks and no owner appears in court to claim them." Columbus-America Discovery Group v. Atlantic Mutual Ins. Co., 974 F.2d 450, 461 (4th Cir. 1992)

20

(internal citations omitted).  In the first context, a party may show abandonment only by a clear and unmistakable affirmative act indicating a purpose to repudiate ownership.  <u>Id</u>.  A federal district court has said that abandonment under the law of finds must be proven by *"clear and convincing evidence,"* such as the owner's express declaration abandoning title.  <u>Falgout Brothers, Inc. v. S/V Pangaea</u>, 966 F. Supp. 1143, 1145 (S.D. Ala. 1997) (citing <u>Columbus-America Discovery Group</u>, 974 F.2d at 461) (emphasis added).

Therefore, we must apply the law of salvage unless American Eagle and A.K. Steel demonstrate through clear and convincing evidence that the owner of the steel, Duferco or later the Plaintiffs, made an express declaration abandoning title.  We now review the pertinent facts.

On July 6, 1994, ICA Representative Victor Bruzzone (Duferco's agent) wrote a letter to American Eagle stating, "[w]ith reference to the aforementioned salvage contract and in conformity with paragraph 6, we are instructed by Duferco, S.A., to cancel said contract of salvage as cargo has been abandoned."  Duferco then sent a letter on July 28, 1994 to Canal Barge saying:

> We hereby advise you and your cargo underwriters that the 'steel slabs' in question have been abandoned by us.  It has been our understanding for some time that you and representatives of your cargo underwriters were aware that the salvage of the cargo in question was impossible due to river conditions, and that the cost of possible salvage operations would exceed the possible market value for the steel commodity in question.  We immediately request that you put your cargo underwriters on formal notice of our abandonment of the cargo.

21

Both sides dispute the meaning of these letters. Bruzzone testified that he was instructed to cancel the salvage contract so that Duferco could declare the cargo a constructive total loss. Bruzzone said that Duferco had not told him they were "abandoning" the cargo; rather Bruzzone picked up the term "abandon" from a Duferco attorney. Bruzzone claimed the purpose of the letter was to cancel the salvage contract. American Eagle contends that Plaintiffs' witness Michael Garin testified that the Plaintiffs considered Duferco's abandonment to be a total abandonment to the world, and the Plaintiffs had no intent of salvaging the cargo or asserting ownership until it did so in April 1995.

Based on the above letters the district court concluded that Duferco had abandoned the cargo on July 28, 1994. The Plaintiffs refused to accept the abandonment in August 1994. Then, in response to the court's declaratory judgment ruling, the Plaintiffs made a partial payment to Duferco in the amount of $986,352.41 in exchange for an assignment of Duferco's rights, if any, against UMS. On February 1, 1995, Plaintiffs and Duferco executed an Assignment and Subrogation Receipt in return for payment on the claim. The Assignment and Subrogation Receipt provided that, "[the Plaintiffs] are entitled at [their] option to take over [Duferco's] interest in whatever may remain of goods, it being understood that delivery to [the Plaintiffs] of the document of title relating to goods shall not be construed as an exercise of such option."

Based on this agreement, the court concluded that Plaintiffs

22

had title to the steel. It held that, even though the Plaintiffs initially rejected the abandonment, they subsequently obtained title to the cargo pursuant to the Assignment and Subrogation Receipt. The court found that there was no "clear and convincing" proof presented at trial that the Plaintiffs expressly abandoned title.

On appeal, American Eagle and A.K. Steel focus on the district court's finding that the Assignment and Subrogation Receipt transferred title to the Plaintiffs. A.K. Steel argues that because Duferco abandoned the steel in July 1994 it no longer had ownership rights which it could transfer to the Plaintiffs on February 1, 1995.[13] Both A.K. Steel and American Eagle note that the Assignment only gave the Plaintiffs an option to take control of the sunken steel. However, the Plaintiffs did not attempt to exercise the option until it learned of the salvage in late April 1995.

Even though the transfer of title from Duferco to the Plaintiffs is not entirely clear, we agree with the district court that there is no clear and convincing evidence that Duferco expressly abandoned title to the cargo before the Assignment to the Plaintiffs. The district court did not commit clear error in its factual findings that Duferco maintained title to the cargo until the Plaintiffs entered into the Assignment and Subrogation Receipt

---

[13] A.K. Steel notes that the Plaintiffs failure to accept the abandonment in August 1994 resulted in titled not passing to them. See Jones Towing, Inc. v. United States, 277 F. Supp. 839, 849 (E. D. La. 1967). Nevertheless, this argument does not defeat the presumption that Duferco retained title.

with Duferco.  We agree that A.K. Steel did not receive title to the steel slabs when it purchased the salvaged cargo from American Eagle.[14]

B.     Conversion by American Eagle and A.K. Steel

The district court concluded that American Eagle and A.K. Steel were liable for negligent conversion of the cargo because they exercised control by sale, purchase and consumption of the steel. These acts totally interfered with the Plaintiffs' right to the steel.  American Eagle argues that it should not be held liable for conversion because it had the right to transfer its possessory right and salvage interest to A.K. Steel.  Again, we review the district court's findings of fact for clear error and legal conclusions de novo.

American Eagle correctly states that through a successful salvage effort it obtained a right of possession in the steel.  To support this proposition, American Eagle suggests that "[o]ne so appropriating abandoned property, or any third person whom he may allow to take it, has a right to the property superior even to that of the former owner, and may hold it against him." Wiggins v. 1100 Tons, More or Less, of Italian Marble, 186 F. Supp. 452, 456 (E.D. Va. 1960).  American Eagle concludes that it had the right to transfer its possessory right and salvage interest to A.K. Steel,

_____

[14]  We find no basis for A.K. Steel's claim that under choice of law rules the Plaintiffs' assertion of title should be governed by the laws of the United Kingdom.

24

which it did on April 26, 1995.

The district court properly concluded that American Eagle and A.K. Steel committed negligent conversion. As already noted, the Plaintiffs maintained ownership and title over the steel under the law of salvage. The law of salvage prescribes how American Eagle must act as salvor of the Plaintiffs' steel. "Salvage law specifies the circumstances under which a party may be said to have acquired, not title, but the right to take possession of property (e.g., vessels, equipment, and cargo) for the purposes of saving it from destruction, damage, or loss, and to retain it until proper compensation has been paid." Columbus-America Discovery Group, 974 F.2d at 460 (quoting Benedict on Admiralty § 158 at 11-15 to 11-16.).

While American Eagle had a right of possession, it did not become the owner of the salved property by virtue of its services and could not transfer title to it. American Eagle "merely has a maritime lien granted by the general maritime law to ensure that [its] reward for saving property will be satisfied out of the property saved." Benedict on Admiralty § 157 at 11-13. Therefore, the district court's conclusion that American Eagle and A.K. Steel were liable for negligent conversion is correct. American Eagle and A.K. Steel had the duty to protect the salved property for the owner and the right to assert a claim against it for the cost of the

salvage.[15]

C.   Issues Raised by A.K. Steel on Appeal

1.   Choice of law regarding the contract

A.K. Steel argues that the trial court erred by failing to perform an adequate choice of law analysis to determine what law should govern the contract between American Eagle and A.K. Steel. A.K. Steel asserts that Ohio law should govern because Louisiana conflicts of law analysis requires that a contractual choice of law provision be given effect unless there is statutory or jurisprudential law to the contrary. Delhomme Industries, Inc. v. Houston Beechcraft, Inc., 669 F.2d 1049, 1058 (5th Cir. 1982) (quoting Associated Press v. Toledo Investors, 389 So.2d 752, 754 (La. App. 3d Cir. 1980)). It contends that as a purchaser of salvaged goods, and not the salvor, maritime law should not apply.

We review choice of law questions de novo. Woodfield v. Bowman, 193 F.3d 354, 358 (5th Cir. 1999). Claims arising out of salvage operations are clearly within the admiralty jurisdiction of the federal courts. Treasure Salvors, Inc., 640 F.2d at 566. We have noted that "[d]isputes concerning the surveillance and sale of cargo are subject to being treated in admiralty." Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co. Inc., 761 F.2d 198, 202 n.4 (5th Cir. 1985). Therefore, since the criteria for admiralty

---

[15] American Eagle's citation to Wiggins, 186 F. Supp. at 456, is unpersuasive as that case concerned property whose owners had abandoned title. In this case, the court properly found that the cargo was only abandoned for salvage purposes.

26

jurisdiction are met, we must apply federal admiralty and maritime laws and not state law.

2.  Ohio Voidable Title Doctrine

A.K. Steel argues that the district court erred when it held that A.K. Steel had no claim or defense pursuant to the Ohio voidable title doctrine.  However, because admiralty jurisdiction includes issues related to the sale of cargo, we apply federal admiralty law and not the Ohio voidable title doctrine in reviewing American Eagle's sale of the cargo to A.K. Steel.

Even if Ohio law did apply, A.K. Steel does not make a valid claim.  The district court found that pursuant to a purchase order, American Eagle sold its possession and salvage interests to A.K. Steel and only warranted documentation of abandonment by owners to underwriters.  The court said "American Eagle neither possessed nor transferred nor warranted title to the salvaged slabs to A.K. Steel."

The court then noted that the Ohio Voidable Title Doctrine could not apply in this case.  The statute provides that: "A purchaser of goods acquires all title which his transferor had or had power to transfer. . . . A person with voidable title has power to transfer good title to a good faith purchaser for value."  Ohio Rev. Code § 1302.44(A).  Because American Eagle did not purport to transfer title of any kind, the court found the statute to be inapplicable.

We review the court's factual findings under a clearly

27

erroneous standard and its legal conclusions de novo. American Eagle never had title to the salvaged steel. Therefore, it could neither transfer nor warrant title to A.K. Steel. In addition, American Eagle never purported to transfer title. American Eagle's agreement with A.K. Steel transferred rights, interest, and possession of slabs retrieved to A.K. Steel, including "rights, and possession in salvage and title rights, if any." The agreement included a warranty which provided "that the slabs have been abandoned for salvage by the owners/underwriters." Under the terms of this agreement, A.K. Steel should have expected to possess the steel but not receive title to it. Therefore, we agree that the voidable title doctrine is inapplicable.

3. Breach of warranty

A.K. Steel next argues that American Eagle breached its expressed warranty with A.K. Steel. A.K. Steel says that American Eagle warranted that the owners/underwriters had abandoned title to the steel allowing it to transfer full title to A.K. Steel, when in fact the steel had only been abandoned for salvage, thus American Eagle could not transfer title. A.K. Steel contends that under Ohio law a purchaser that relies on the express warranty of a seller of goods and suffers injury may sue to recover damages for breach of express warranty. Plastic Moldings Corp. v. Park Sherman Co., 606 F.2d 117 (6th Cir. 1979). Again, because this issue involves the sale of marine cargo, we must apply federal admiralty law and not state law.

28

Even if state law did apply, we conclude that there was no breach of warranty. First, American Eagle stated in its purchase order that it was selling "possession in salvage and title rights, if any" and that the "slabs had been abandoned for salvage." In addition, American Eagle refused to sell the steel to a buyer that demanded warranty of title, even though that buyer offered to pay more for the steel. Because American Eagle did not purport to transfer anything but the rights it had "if any," it likewise did not expressly warrant to A.K. Steel that it was transferring title. Moreover, A.K. Steel, as the original purchaser, knew that the steel belonged to Duferco. Therefore, American Eagle cannot be liable for breach of warranty.

D. Issues Raised by Plaintiffs on Appeal

1. The salvage claim

The Plaintiffs first argue that the district court erred in finding that American Eagle and A.K. Steel possessed a valid salvage claim. With this valid claim, the district court subsequently granted American Eagle and A.K. Steel an award for salvaging the steel slabs, which was offset by the conversion judgment. Plaintiffs contend that American Eagle and A.K. Steel performed neither of the requirements to establish the right to a claim. They neither filed for a salvage lien nor returned the cargo to the owners. Since they failed to preserve the right to a claim, the right never existed.

The Plaintiffs do not dispute the court's finding that an

initial salvage claim existed. A salvage claim exists when there is: (1) a maritime peril to the property; (2) voluntary service by the salvor; and (3) the salvage effort is successful in whole or in part. Schoenbaum, Admiralty and Maritime Law § 16-1 at 324. However, Plaintiffs correctly point out that the two defendants failed to preserve the right to the salvage claim within the two-year statute of limitations period.

Although the statute of limitations period for filing a salvage claim had passed, the district court concluded that A.K. Steel and American Eagle were entitled to assert a salvage claim as an affirmative defense and as a basis for recoupment in response to Plaintiffs' claim to quiet title. Citing Basic Boats, Inc. v. United States, 311 F. Supp. 596, 597 (E.D. Va. 1970), the court noted that "there is ample authority to the effect that the counterclaim should be treated as an affirmative defense by way of recoupment, and this is true even though as an affirmative cause of action it may be barred by limitation."

Plaintiffs argue that the district court misapplied Basic Boats because in that case the U.S. Navy defended against a damage claim with the shield of an expired salvage claim because it preserved the salvage right by returning the vessel to its owners. American Eagle and A.K. Steel, however, did not return the salvaged property to its owners.

We conclude that the court did not err in relying on Basic Boats. Although the two defendants did not preserve a salvage claim

30

in the traditional manner, they did properly assert such a right as an affirmative defense and recoupment to Plaintiffs' claims.  We must now determine whether or not A.K. Steel and American Eagle should receive a salvage award for their efforts.  This question turns on a determination whether or not they acted in good or bad faith during the salvage and subsequent transfer of the steel.

2.  Did American Eagle and A.K. Steel act in good faith?

A salvor has an obligation to bring aided property to a safe place for the eventual return to the owner.  A salvor may not keep the salved property and, if she did so, would become liable for conversion.  Benedict on Admiralty § 157 at 11-13.  Justice Story noted that "[i]n cases of salvage, the party founds himself upon a meritorious service, and upon the implied understanding, that he brings before the court, for its final award, all the property saved with the entire good faith; and he asks a compensation for the restitution of the uninjured, and unembezzled by him."  The Boston, 3. F.Cas. 932, 937 (1833).

A salvor obviously will not receive an award if he loses the property or acts in bad faith.  But it is not entirely clear what constitutes bad faith.  Storey noted that embezzlement by salvors must be punished by forfeiture of the salvage claim.  Id.  More recently this Circuit has said that admiralty courts must be vigilant in protecting mariners from unscrupulous and dishonest salvors.  "[T]he law cannot tolerate salvors [sic] dishonesty, corruption, fraud, falsehood, either in rendering service, or in

31

their proceedings to recover the salvage." Jackson Marine Corp. v. Blue Fox, 845 F.2d 1307, 1309 (5th Cir. 1988) (citing Church v. Seventeen Hundred and Twelve Dollars, 5 F.Cas. 669 (S.D. Fla. 1853)). In addition, a salvor forfeits any award where he is guilty of gross negligence, looting or spoilage of the salved property. Admiralty and Maritime Law 16-4 at 329.

Based in part on these legal standards the district court found no bad faith on the part of American Eagle or A.K. Steel for salvaging and transferring the steel:

First, [Douglas] Adams' testimony confirms that he knew that the salvaged steel had been abandoned by Duferco in July 1994. Adams knew that if he salvaged the steel he could claim a possessory right of salvage only since he did not own the steel. Adams specifically chose the one purchaser who agreed to this term, namely that American Eagle only warrant abandonment of the cargo but not warrant title. Adams accepted a significantly lower bid in order to obtain this term because the higher bidder insisted on warranty of title, which Adams knew he could not do. Likewise, A.K. Steel purchased the salvaged steel without warranty of title, assuming the risk that its title to the steel could be challenged by plaintiffs.

The Court is critically aware that the cargo would not have been salvaged but for the efforts of American Eagle and the American Eagle would not have bothered to salvage the cargo were it unable to line up an acceptable purchaser in advance of its efforts. American Eagle successfully salvaged 128 slabs of steel, and did so in good faith, notwithstanding American Eagle's failure to halt delivery of the salvaged steel to plaintiffs on April 27, 1995, upon their assertion of ownership. A.K. Steel purchased the salvaged steel in good faith without warranty of title and immediately consumed the steel into production.

The Court finds no 'bad faith' on either American Eagle or A.K. Steel based on their unresponsiveness to plaintiffs' demand that sale, delivery and consumption of the salvaged steel should halt at the instant it asserted its ownership interest. The letter of July 6, 1994, stated that the cargo

was abandoned.  Significantly, the letter did not provide that the cargo was abandoned to the underwriters or anyone else.

The Plaintiffs argue that the court erred in these conclusions. Plaintiffs reiterate many of their earlier arguments against American Eagle and A.K. Steel, which Plaintiffs suggest all point to bad faith.  First, American Eagle attempted to sell the steel even though it knew it did not have title.  American Eagle and A.K. Steel were both knowledgeable salvors and should have known that the cargo belonged to someone else.  They bought and sold property that was not theirs even after the Plaintiffs wrote them insisting that they cease salvaging the cargo.  Finally, the district court concluded that American Eagle and A.K. Steel were liable for negligent conversion.  These acts, the Plaintiffs argue, all point to bad faith.

We review the district court's factual findings for clear error.  The record reveals that American Eagle and A.K. Steel may not have acted entirely in good faith.  Perhaps, they did not act in good faith when they ignored the Plaintiffs' request that they halt the sale, delivery and consumption of the salvaged steel.

Nevertheless, the district court did not commit clear error in determining that American Eagle and A.K. Steel did not act in bad faith nor commit gross negligence, embezzlement, fraud, or corruption.  Until the April 1995 letter from the Plaintiffs asking them to cease the sale of the cargo, the only other communication regarding the cargo stated that it had been "abandoned."  As

33

discussed above, the purpose of ICA's abandonment letter was not crystal clear. American Eagle had some basis to believe it could salvage the steel and at least transfer a possessory interest. Consequently, A.K. Steel could expect to receive a possessory interest in the steel. American Eagle knew that it did not have title to the steel and never attempted to transfer title. We agree with the district court that American Eagle and A.K. Steel acted negligently but their behavior did not rise to bad faith under the law.

3.  The 20 percent discount

The district court reduced the cargo's value by 20 percent because the steel was salvaged, which would cause concern about possible damage from submergence, and because American Eagle did not have the steel's chemistries. The Plaintiffs contend that it was clearly erroneous for the district court to apply this discount, and this court should reverse and amend the judgment to reflect the steel's true value of $895,000.[16]

The court applied this discount based on the testimony of Plaintiffs' value expert George Hynson. He testified that if the chemistries of the steel were unavailable the price could be reduced by 5 to 20 percent. Hynson testified that the discount was based on the seller not possessing the composition chemistries of the

---

[16]  This figure is based on a $300 per net tonnage for the steel multiplied by the total tonnage of the steel. The district court reduced this figure by 20 percent to $240, thereby arriving at the $716,400 value.

steel, which placed the seller at a disadvantage in negotiations to sell the cargo. However, Plaintiffs argue that they had the chemistries to the steel.

The district court reduced the spot market price of the steel not only because a purchaser would not have the chemistries; but in addition, because a purchaser would be concerned about the possible damage from submergence or salvage. This is a realistic concern. Therefore, we conclude that the court did not commit clear error in reducing the price of the steel.

4. The sunken tug

Plaintiffs also argue that the district court committed clear error in not permitting testimony on whether the salvage claim should be reduced by the cost of an additional salvage recovery during the salvage operation. The court refused to permit the Plaintiffs to cross-examine Douglas Adams on the additional $66,000 salvage award he received for raising a tug sunk during the salvage operation. Plaintiffs argue that this amount should be deducted from the court's salvage award of $525,424.32 in order to mitigate damages. We conclude that the court did not err. The Plaintiffs and American Eagle stipulated to a dollar amount for salvage services. This stipulated amount controls.

E. Coverage Under Britamco's Insurance Policy

Britamco argues that the district court erred as a matter of law in holding that the general liability insurance policy issued by Britamco to American Eagle covered American Eagle's negligent

35

conversion.  The court concluded that the policy's exclusion from coverage for "property damage expected or intended from the standpoint of the insured" did not apply to American Eagle.  The court said that there was no evidence that American Eagle intended to deprive the Plaintiffs of their property.  Subsequently, the court entered a judgment for the Plaintiffs against Britamco.

We review a district court's interpretation of an insurance policy de novo.  FDIC v. Mijalis, 15 F.3d 1314, 1319 (5th Cir. 1994).  We interpret the provisions in this insurance policy under Louisiana law since the contract was delivered in Louisiana.  The extent of coverage is determined by the words of the policy.  We construe the policy's words and phrases using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.  When the language is clear, the agreement must be enforced as written.  Reynolds v. Select Properties, Ltd., 634 So.2d 1180, 1183 (La. 1994).

The policy's coverage provision states, "[i]nsurers agree to pay those sums that the Insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies. . . . The . . . 'property damage' must be caused by an 'occurrence.'"  (Emphasis added).  The policy defines 'occurrence' as: "an accident including continuous or repeated exposure to substantially the same general conditions, which first take place during the policy period."  (Emphasis added).

36

We look first to see if the events constituting conversion are within the coverage clause of this policy. Only if they are, do we consider the exclusionary provisions. We note that to have coverage the conversion of the steel must be an occurrence and to be an occurrence under this policy it must be an accident.

Black's Law Dictionary 15 (6th ed. 1990) defines an accident as "a fortuitous circumstance, event, or happening; an event happening without any human agency, or if happening wholly or partly through human agency, an event which under the circumstances is unusual and unexpected by the person to whom it happens . . . ." As a salvor, American Eagle had the right to possess the steel and the duty to either return the steel to the Plaintiffs or file a salvage lien to obtain compensation. American Eagle did not do that. Instead, American Eagle intentionally transferred possession of the steel to A.K. Steel, who subsequently consumed the steel. This transfer, purchase and consumption negligently interfered with the Plaintiffs' ownership of the steel. Therefore, American Eagle and A.K. Steel committed negligent conversion.

This act was not an accident or a fortuitous event. American Eagle's and A.K. Steel's interference constituted more than an accidental or unexpected event. A reasonable person would not transfer, purchase and consume the steel without regard for the true owner's interest. Given the facts of this case, we conclude that American Eagle's and A.K. Steel's negligent conversion was not an accident, and thus is not covered by Britamco's insurance policy.

37

A.K. Steel contends that we should interpret American Eagle's negligent conversion pursuant to the policy's first exclusion to coverage, which provides that insurance does not apply to "'Property Damage' *expected or intended* from the standpoint of the insured." (Emphasis added). A.K. Steel notes that under some Louisiana law an occurrence clause includes intentional acts when the results of the acts are unintended or unexpected. The Alert Centre, Inc. v. Alarm Protective Services, Inc., 967 F.2d 161, 164 (5th Cir. 1992). Therefore, it argues, the policy covers American Eagle's unintended negligent conversion. This argument is unpersuasive. First, because we concluded that negligent conversion was not an occurrence under the policy's coverage section, there is no need to apply the policy's exclusions. There is no coverage in the first place. Second, A.K. Steel cites case law which concerns policies having a broader definition of occurrence than Britamco's policy. See Id.; Auster Oil & Gas, Inc. v. Stream, 891 F.2d 570, 580 (5th Cir. 1990).

We reverse the district court and find no coverage under the Britamco policy. We therefore vacate the Plaintiffs' judgment against Britamco.

## CONCLUSION

For the foregoing reasons, we affirm in part, reverse and remand in part, and reverse and vacate in part.

38