The PLASTIC MOLDINGS CORPORA-
TION, Plaintiff-Appellant,

v.

PARK SHERMAN COMPANY,
Defendant-Appellee.

Nos. 77–1387, 77–1388.

United States Court of Appeals,
Sixth Circuit.

Argued April 10, 1979.

Decided and Filed Sept. 28, 1979.

Stanley M. Chernau, Denney, Lackey & Chernau, Stephen M. Miller, Nashville, Tenn., for defendant-appellee.

Before ENGEL and MERRITT, Circuit Judges, and PECK, Senior Circuit Judge.

MERRITT, Circuit Judge.

Park Sherman Company manufactures disposable cigarette lighters at its plant in Murfreesboro, Tennessee. In October 1973, Park Sherman contracted to purchase from Plastic Moldings Corp., an Ohio concern, plastic parts for the lighters. The components supplied by Plastic Moldings never conformed to Park Sherman's specifications, despite year-long efforts to rectify the problem and salvage the deal. In this diversity action, the District Court awarded Park Sherman consequential damages for breach of express warranties and ordered restitution of monies Park Sherman had paid for the molds that produced the defective plastic parts. On appeal, Plastic Moldings does not contest its liability but raises various objections to the relief granted. We affirm as to all but one item of the District Court's award.

## I.

The basic terms of the contract are not in dispute. Plastic Moldings agreed to produce, and Park Sherman agreed to buy, 5,000,000 units of each of four different plastic parts that could be assembled into finished lighters. The four parts were the lighter tank, the fluid plug, the tank bottom, and the thumb lift. The District Court found that Plastic Moldings had expressly warranted that all of the parts ordered would conform to specifications submitted by Park Sherman. The parts were to be manufactured from molds, precisely tooled so that each part produced would match every other part of the same kind and so that all four kinds of parts could be easily assembled and machine-welded into lighters ready for sale to Park Sherman's customers. Under the agreement, Plastic Moldings assumed the responsibility for ob-

Richard F. LaRoche, Sr., Murfreesboro, Tenn., Louis F. Gilligan, Richard Creighton, Keating, Muething & Klekamp, Cincinnati, Ohio, for plaintiff-appellant.

taining molds capable of producing parts up to specifications, and Park Sherman agreed to purchase the molds at a price equal to Plastic Moldings' cost of obtaining them.

In June 1974, approximately six months behind schedule, Park Sherman finally received samples of the four parts for approval. The samples were unsatisfactory, and Park Sherman so informed Plastic Moldings. Modifications of the molds were requested and made. The first shipment under the contract came in August 1974. Some of the parts were undersized, the bottoms did not fit the tanks, the threads by which the plugs were supposed to fit into the lighters were not uniform, and there were numerous other defects. In the words of the District Court, "the production was a disaster."

Park Sherman immediately notified Plastic Moldings of these problems, and the parties collaborated on possible solutions in a series of meetings. During the course of these negotiations, shipments under the contract continued. As Plastic Moldings knew from the outset of the transaction, Park Sherman faced a demanding production schedule of its own, having accepted orders for several thousand lighters from various distributors. Hoping to make the best out of a bad situation, Park Sherman thus resolved to continue accepting deliveries, to use whatever portion of each shipment could be salvaged, and to reject the rest. Throughout this period, Plastic Moldings promised that the defects could be, and would be, corrected and actually made several changes in the molds to that end. Plastic Moldings was at all times on notice that its performance was unsatisfactory and that, as a result, Park Sherman was

incurring additional production costs. The defects were never significantly corrected, and, in April 1975, Park Sherman refused to take any more deliveries. In the meantime, it had made arrangements with another molding company for an alternative supply of plastic lighter components.

This litigation began when Plastic Moldings brought suit in Tennessee state court for the price of all parts that had been accepted but not paid for by Park Sherman. Park Sherman removed the case to Federal Court[1] and counterclaimed for damages and other relief alleging breach of warranty. After a bench trial, the District Court awarded Plastic Moldings $33,218.97, representing the total unpaid price of parts Park Sherman had accepted under the contract. Park Sherman has not appealed that ruling. On Park Sherman's breach of warranty counterclaim, the District Court entered a judgment against Plastic Moldings totaling $144,309.72, from which Plastic Moldings now appeals.[2]

## II. Consequential Damages

The District Court's award of consequential damages included the following items:

1) $5,275.68 for increased production costs caused when Park Sherman was forced to use hand labor to assemble the usable parts rather than machines;

2) $18,147.05 for the cost of hand sorting and matching usable lighter tanks and bottoms which would not have been incurred had the tanks and bottoms conformed to specifications;

3) $17,783.49 for the purchase of certain substitute parts necessitated by the fact that valve openings in the parts

1. The case was not properly removable because the removing defendant, Park Sherman, is a resident of the state in which the action was brought, Tennessee. 28 U.S.C. § 1441(b). However, the case was within the District Court's original jurisdiction, since the parties are of diverse citizenship and the amount of controversy was greater than $10,000, 28 U.S.C. § 1332; and, Plastic Moldings' acquiescence in the removal waived any objection it might have had in this regard. See generally 1A Moore's Federal Practice ¶ 0.157[5], at 103, ¶ 0.157[11], at 135–52.

2. The appeal (No. 77–1388) is from the judgment of the District Court, dated June 7, 1977. Plaintiff-appellant, Plastic Moldings Corporation, also filed notice of appeal from the order dated December 17, 1976, in which the District Court preliminarily ruled on the issue of the parties' liability *inter se* but reserved the question of appropriate relief. That appeal (No. 77–1387) was taken from a non-final order and is therefore dismissed. 28 U.S.C. § 1291 (1976).

provided by Plastic Moldings were undersized; and,

4) $14,447.15 lost on the return of numerous finished lighters to Park Sherman by its customers because the lighters were defective.

■ 1. Plastic Moldings' principal claim is that Park Sherman was not entitled to recover consequential damages of any sort on its breach of warranty claim, because the loss sustained by Park Sherman was occasioned by its own decision to accept and use the defective parts. Framed in the language of Tennessee's version of Article II of the Uniform Commercial Code,[3] which governs the rights and liabilities of the parties. The argument is that Park Sherman has been wrongfully compensated for a "loss . . . which could [have] reasonably [been] prevented by cover or otherwise."[4]

We agree with the District Court that this was an appropriate case for consequential damages[5] and reject Plastic Moldings' claim. It was commercially reasonable for Park Sherman to continue accepting deliveries under the contract and to attempt to salvage the usable portion of Plastic Moldings' non-conforming tender while awaiting the outcome of Plastic Moldings' efforts to cure the defects. Indeed, any other course of action would have been perilous.

Under a contract to be performed in installments such as this one, a buyer may cancel the contract only upon a "nonconformity or default with respect to one (1) or more installments [which] substantially impairs the value of the whole contract."[6] In view of Plastic Moldings' assurances that it could cure the defects and that later ship-

ments would eventually conform to specifications, Park Sherman could not safely have concluded that the nonconformity of the early installments would substantially impair the value of the whole contract and thus might have found itself in breach of the contract had it followed the advice Plastic Moldings now offers. It is not surprising that, facing a $144,000 judgment, Plastic Moldings now wishes that Park Sherman had breached the contract at the outset so that Plastic Moldings could have escaped the consequences of its own breach of warranty. But that is hardly a valid criticism of Park Sherman's decision not to risk breach and to continue in the contractual relationship until Plastic Moldings' inability to produce parts as warranted had become apparent.

Moreover, even assuming that Park Sherman could have backed out of the deal at some earlier time without breaching the contract, that course certainly was not required. Upon discovery of the defects in the early shipments, Park Sherman was entitled to insist that shipments continue on schedule and that the defects be cured, i. e., that Plastic Moldings perform as agreed. And, by timely notifying Plastic Moldings of the defects in the parts shipped, Park Sherman preserved all of its remedies under the Code, including its right to consequential damages under § 2–715 for breach of warranty as to any parts accepted.[7] Plastic Moldings did not present any evidence at trial to suggest that Park Sherman failed to "cover" with an immediately available alternative source of plastic lighter components or that Park Sherman unreasonably delayed in seeking the alternative supplier it ultimately found.[8] Nor is there anything

3. Tenn.Code Ann. §§ 47–2–101 et seq. (1964 & Cum.Supp.1977).

4. U.C.C. § 2–715(2)(a); Tenn.Code Ann. § 47–2–715(2)(a) (1964 & Cum.Supp.1977).

5. A buyer is entitled to consequential damages proximately caused by his seller's breach of warranty. U.C.C. § 2–715(2); Tenn.Code Ann. § 47–2–715(2) (1964 & Cum.Supp.1977). See Mid-South Milling Co. v. Loret Farms, Inc., 521 S.W.2d 586, 589 (Tenn.1975); Ford Motor Co.

v. Taylor, 60 Tenn.App. 271, 446 S.W.2d 521 (1969).

6. U.C.C. § 2–612(3); Tenn.Code Ann. § 47–2–612(3) (1964 & Cum.Supp.1977).

7. U.C.C. § 2–607(3)(a); Tenn.Code Ann. § 47–2–607(3)(a) (1964 & Cum.Supp.1977). See Edwards-Warren Tire Co. v. J. J. Blazer Constr. Co., 565 F.2d 401 (6th Cir. 1977).

8. Plastic Moldings cites Park Sherman's efforts to find another supplier as evidence of bad faith. Plastic Moldings asserts that it would

in the record to indicate that Park Sherman otherwise failed to mitigate its loss.[9] In these circumstances, Plastic Moldings' attack upon the award of consequential damages is unpersuasive.

■ 2. Plastic Moldings specifically challenges only one item of the consequential damages award. Plastic Moldings argues that, even assuming Park Sherman is entitled to recover some measure of consequential damages, the District Court should not have included in the award the $18,-147.05 Park Sherman was forced to spend sorting and matching lighter tanks and bottoms, designated as item # 2 above. The claim is that a buyer should not be entitled to any allowance for the time and labor spent in separating conforming goods from nonconforming goods and rejecting the latter. In other words, Plastic Moldings asserts that a buyer should ordinarily bear the expense of inspecting goods tendered by a seller to determine whether the goods are conforming and to decide what portion of them, if any, will be rejected.[10]

We have no quarrel with that general proposition, but we think it beside the point in this case, because it is clear that the award of sorting and matching costs did not operate to compensate Park Sherman for such ordinary inspection expenses. If Plastic Moldings had performed in accordance with the contract warranties, any part produced from one mold would have mated with the appropriate part produced from any other mold. The effect of Plastic Moldings' breach of warranty was to destroy this interchangeability of parts. Thus, in order to make use of any portion of Plastic Moldings' tender, Park Sherman was required to incur the otherwise unnecessary expense of hand sorting the parts, to see which tanks could be matched with which tank bottoms, and vice versa. The process of sorting and matching no doubt also uncovered some parts that were totally unusable and that, accordingly, had to be rejected. But in our view that fact does not preclude Park Sherman from recovering the cost of sorting and matching *usable* parts, a foreseeable expense directly attributable to the seller's breach of warranty.

Finding no merit in either of Plastic Moldings' objections to the award of consequential damages, we affirm that award *in toto*.

### III. Restitutionary Award

■ 1. As earlier mentioned, in addition to consequential damages, the District Court also ordered restitution of monies Park Sherman had paid for the molds that produced the defective parts. The agreement provided that Plastic Moldings would procure appropriate molds for the four types of parts ordered and that Park Sherman would purchase the molds at cost. In March 1974, when the relationship broke down, Park Sherman had paid $24,150 toward purchase of the molds. The District Court ordered Plastic Moldings to return the entire amount to Park Sherman. The defective molds remain at Plastic Moldings' plant.

We have no difficulty upholding this award. Park Sherman agreed to purchase molds capable of producing parts up to its specifications. Plastic Moldings never provided such molds. Accordingly, Park Sherman was not obligated to pay for them.

We are not persuaded by either of Plastic Moldings' arguments to the contrary. The first is that Park Sherman "accepted" the molds by using a portion of the parts produced by them and by paying a substantial

---

never have continued its dealings with Park Sherman had it known that Park Sherman was negotiating for another plastic molder to take over production and was planning to sue for damages for Plastic Moldings' breach of warranty. Brief of Plaintiff-Appellant at 19. A businessman in Park Sherman's situation does not act unreasonably or in "bad faith" when it opens negotiations with another source of supply for a more reliable product. We do not know what course Park Sherman would have followed had Plastic Moldings not initiated suit first.

**9.** *See Lewis v. Mobil Oil Corp.*, 438 F.2d 500, 509–10 (8th Cir. 1971).

**10.** *See* 2 R. Anderson, Uniform Commercial Code § 2–601:24 (2d ed. 1971).

amount toward their purchase.[11] Having "accepted" the molds, the argument continues, Park Sherman should be required to pay for them at the contract price and is entitled to recover, at most, damages for breach of warranty—"the difference at the time and place of acceptance between the value of the goods accepted and the value they would had if they had been as warranted." [12]

Again, the argument is largely beside the point. For, even if it can be said that Park Sherman "accepted" the defective molds as Plastic Moldings contends, it is equally plain from the record that such acceptance was made "on the reasonable assumption that . . . [the defects] would be cured" and, therefore, the acceptance could lawfully be revoked because cure was never forthcoming.[13] "A buyer who so revokes has the same rights . . . with regard to the goods involved as if he had rejected them." [14] Thus, whether one concludes that Park Sherman rejected the molds or, instead, that Park Sherman accepted the molds and then lawfully revoked acceptance really makes no difference. In neither case would Park Sherman be obligated to pay for the molds.

Nor do we think that Park Sherman has somehow been unjustly enriched by this award. Plastic Moldings argues that the effect of returning all of the purchase money to Park Sherman is to give Park Sherman "free use" of the molds during the period they were actually producing parts. This argument overlooks the fact that Park Sherman contracted to purchase, and Plastic Moldings agreed to provide, two things: (1) molds that could produce parts meeting specifications, and (2) the parts themselves. Park Sherman did not contract to pay for the "use" of anything. It may be that Plastic Moldings is referring to the value of the effort involved in applying the molds to the raw materials to produce the finished plastic parts. But that value was presuma-

bly reflected in the price Plastic Molding charged per part; and, Park Sherman has paid for all of the parts it accepted. In short, we do not see how this aspect of the District Court's award results in giving Park Sherman anything "free."

2. We do agree with Plastic Moldings' attack upon the remaining item of the District Court's award. On September 9, 1974, almost a year after the original contract, Park Sherman executed another purchase order, this one for a fifth mold (known to the parties as "the second tank mold"), in addition to the four molds ordered under the original contract. The contract price was $58,000. Delivery was to occur 30 weeks after Plastic Moldings' receipt of the order.

The purchase order contained the following cancellation clause:

(4) Park Sherman Co. reserves the right to cancel this order at any time. However, at the date of cancellation, Park Sherman agrees to pay Plastic Moldings Corp. for materials, labor and tooling used up to date of cancellation.

On November 18, 1974, approximately nine weeks after Plastic Molding had received the purchase order, Park Sherman exercised its right to cancel. Park Sherman had already paid $19,000 toward purchase of the second tank mold and, upon cancellation, paid an additional $15,000 in settlement of its obligation under the cancellation clause. The District Court ordered all of this money returned to Park Sherman.

This was error. We can see no basis for relieving Park Sherman of its obligation under the cancellation clause, which Park Sherman itself inserted in the agreement. Park Sherman contends that the validity of the purchase order for the second tank mold was expressly conditional upon resolution of the problems the parties were encountering

---

11. See U.C.C. § 2–606; Tenn.Code Ann. § 47–2–606 (1964 & Cum.Supp.1977).

12. U.C.C. § 2–714(2); Tenn.Code Ann. § 47–2–714(2) (1964 & Cum.Supp.1977).

13. U.C.C. § 2–608(1)(a); Tenn.Code Ann. § 47–2–608(1)(a) (1964 & Cum.Supp.1977).

14. U.C.C. § 2–608(3); Tenn.Code Ann. § 47–2–608(3) (1964 & Cum.Supp.1977).

under their original agreement and that, because Plastic Moldings never corrected the defects in the first set of molds, the purchase order never became effective. We are not persuaded. The order contains no such condition on its face, and the record does not establish that the parties had a parol agreement to that effect.[15] Moreover, Park Sherman's own actions belie the interpretation it now seeks to give the agreement. When Park Sherman cancelled the order for the second tank mold, it did not demand return of the $19,000 already paid on that account, but instead, precisely as contemplated by the cancellation clause, paid the additional $15,000 necessary to reimburse Plastic Moldings for the tooling and material costs incurred to that point in preparing the mold. Park Sherman would not have made this payment had it really believed, as it now claims, that the purchase order had never become effective and that it did not owe Plastic Moldings anything in consideration for exercising its right to cancel.

We, therefore, reduce the judgment against Plastic Moldings by $34,000, the sum the District Court ordered returned to Park Sherman in connection with the second tank mold. The judgment of the District Court is otherwise affirmed.

---

**15.** The only evidence that Park Sherman cites in support of this claim is a letter, dated September 9, 1974, from Project Engineer Nelson Walker to Mr. Al Masset of Plastic Moldings Corp. It states in pertinent part (App. Vol. I at 477):

It must be STRONGLY noted that we at Park Sherman Co. cannot stand to have the mold and production problems on this new mold that we are experiencing on the existing mold. Also, this new tank mold must be made to the new print dimensions that are under consideration at present. It is further understood that in order to validate this new

mold and purchase order, all dimensional characteristics must be submitted and approved by both PMC and Park Sherman Co. Plainly the letter cannot be read to condition the purchase order in the manner asserted by Park Sherman. The letter merely expresses Park Sherman's hope that the problems experienced with the first set of molds would not be repeated in connection with production of the second tank mold. The only condition the letter places upon the validity of the purchase order is the agreement of the parties on the specifications of the new mold. Park Sherman has not alleged a failure of that condition.