IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-20588

---

GLOBAL OCTANES TEXAS, L P

                    Plaintiff - Appellant-Cross-Appellee,

                versus

BP EXPLORATION & OIL INC,
formerly known as BP Oil Company

                    Defendant - Appellee-Cross-Appellant

---

Appeals from the United States District Court
for the Southern District of Texas

---
September 14, 1998

Before REYNALDO G. GARZA, HIGGINBOTHAM, and EMILIO M. GARZA,
Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This is a suit on a contract for the sale of a gasoline additive. The district court granted summary judgment for the seller, concluding that the buyer had no contractual right to terminate and had breached the contract in doing so. It then applied a provision of the contract to limit damages to $500,000. BP Exploration, the purchaser, urges that the district court erred in rejecting its right to terminate the contract. Global Octanes, the seller, attacks the limitation of damages and defends the finding that BP breached the contract. We affirm.

Environmental regulation created a market for methyl tertiary butyl ether, MTBE, an additive designed to raise octane levels and oxygenate gasoline. On August 26, 1991, Global and BP executed a Product Supply Agreement obligating Global to sell and BP to buy minimum quantities for a five-year period. The contract has a take or pay feature in that BP was obligated to pay for the minimum amounts whether purchased or not. The prices were set by a formulae and did not fluctuate with the market. The market price dropped creating a difference between the market price and the contract prices of approximately $1,000,000 for each month of purchases. Global declined BP's request to negotiate new price terms. The market prices continued at this lower level and over the three-year period the contract was in force, the difference between the contract price and the market price summed to over $40,000,000, or roughly 40,000 each day. BP, nonetheless, did not invoke the damage cap of $500,000 it would later rely upon. Rather, on September 5, 1995, after EPA issued rules in January and July 1995, BP gave Global written notice of termination. It relied upon paragraph 14(b) of the contract, a provision treating changes in law. This suit followed.

II

BP's claimed right to terminate the five-year contract turns on the applicability of the agreement regarding changes in law found in paragraph 14(b) which provides:

> 14(b) Changes in Law. If, during the
> term of this agreement the Clean Air Act, PL

101-549, is amended and becomes effective, or any final, non-appealable rules or regulations promulgated thereunder become effective, so as to no longer require the use of reformulated motor gasoline (as defined in the Clean Air Act) in an area or areas of the United States wherein the Buyer markets motor gasolines, thereby eliminating the Buyer's requirements for MTBE Product as an oxygenate (the "Amendment"), then either party hereto may, upon thirty (30) days notice to the other, convene a meeting to discuss an equitable resolution of any alleged hardship resulting to such party as a result of the Amendment; provided, however, that if such meeting does not lead to a resolution within sixty (60) days from the date of commencement, either party may terminate this Agreement upon sixty (60) days' written notice to the other party.

The district court in its carefully crafted order detailed three required triggers to a right to terminate the agreement under its change in law provision. First, changes in the Clean Air Act or its implementing regulations. Second, reformulated motor gasoline must no longer be required "in an area or areas of the United States wherein the Buyer markets motor gasolines." Third, the EPA action must eliminate the buyer's requirements for MTBE Product as an oxygenate". The first two were ultimately not at issue and we turn to the third. It had two aspects.

The first is a contention that product as used in the change in law provision means only product from the Deer Park facility. The changes in EPA rules eliminated the need for MTBE in Western Pennsylvania, an area where BP sold motor gasolines, and which had required 80,000 barrels per month of MTBE. BP points to the language, "so as to no longer require the use [RFG]...in an area or

3

areas of the United States wherein [BP] markets motor gasolines, thereby eliminating [BP's] requirements for MTBE Product as an oxygenate...." The argument continues that the EPA rules thus ended the use of product in an area in which BP marketed its gasoline; that this ended a need for MTBE in an amount in excess of the 75,000 barrels per month required to be purchased by the agreement. The argument, more nuanced before the district court, has narrowed to the present contention that the EPA rules eliminated BP's requirements for MTBE Product manufactured at Global's Deer Park facility. As the district court pointed out, this reading of product is in tension with other provisions of the agreement, such as the provision for "suspension of deliveries" dealing with replacement product, a term not limited to the Deer Park facility.

We need not travel the semantical paths of this aspect, for BP's contention suffers a more fundamental flaw in its second aspect. As the district court noted, without a qualifying phrase such as "in such area or areas" following the elimination of buyer's requirements language in the agreement, the provision means that a change in law does not trigger a right to terminate unless BP's need for MTBE as an oxygenate is eliminated entirely, not just in an area in an amount in excess of its required purchase under the agreement. BP's need for MTBE as an oxygenate was reduced, but it was never eliminated.

BP explains that it intended that the provision allow it to terminate the contract when a change in law caused it to need less

4

MTBE as an oxygenate than it was obligated to purchase from Global. BP had a contract with ARCO for MTBE that lacked a change in law provision. It insisted upon the change in law provision in the agreement with Global, anticipating that a loss of a market area might eliminate its need to purchase MTBE as an oxygenate from a source other than ARCO. This is a rational explanation of what BP wanted in the agreement. The difficulty is that the contract, plainly and unambiguously describes an elimination of need for product, not the elimination of need for a second source of supply.

### III

Paragraph 11 of the agreement provides in relevant part:

In no event shall the liability of either party under this Agreement (other than the obligation to pay for delivered Product or provide timely credit for replacement Product, each of which shall be unconditional) exceed $500,000.

The district court enforced this provision as a cap on damages for breach of the agreement. Since any damages indisputably exceeded the cap, the district court entered summary judgement for Global in the amount of $500,000, together with prejudgment interest.

Global first urges that the district court failed to give it adequate opportunity to confront BP's limitation of remedy defense, entering summary judgment, sua sponte. Second, paragraph 11 fails under Tex. Bus. & Com. Code, § 2.719, because it is not an exclusive remedy, alternatively, it fails of its essential purpose. The argument continues that it is not exclusive because its text provides no cap on damages for buyer's non-payment and BP's actual

5

performance of the agreement makes plain that Paragraph 11 was not intended to limit damages for wrongful termination of the agreement. Third, the damages specified are disproportionately and unreasonably low, this is a liquidated damages clause, and fails under § 2.718.

BP replies that the sua sponte summary judgment was appropriate, the limitation on damages enforceable, the exclusive remedy analysis inapplicable, the purpose did not fail, no penalty analysis is appropriate and there was no error in not considering the BP's asserted "performance" of the agreement.

1

We turn first to Global's contention that the district court failed to give it a fair opportunity to address the cap of damages, specifically, notice of its intent to grant summary judgment, sua sponte. Global filed its "final" motion asserting that it was dispositive on all issues. It had filed two separate responses regarding BP's limitation of damages defense and evidence in support of its responses. These filings included oral depositions in which witnesses from BP and Global testified about the cap. We are persuaded from our review of the record that Global had a full and fair opportunity to develop the record and marshal its arguments. See British Caledonia Airways, Ltd. v. First State Bank, 819 F.2d 593 (5th Cir. 1987).

2

Global contends that because the obligation to pay for "delivered Product " is unconditional in the parenthetical in

6

paragraph 11, the district court erred in limiting Global's recovery to $500,000 for its breach. Under Texas law, "contracting parties can limit their liability in damages to a specified amount," see Vallance & Co. v. Anda, 595 S.W.2d 587, 590 (Tex. Civ. App.--San Antonio 1980, no writ) (non-U.C.C. case regarding services contract); Tex. Bus. & Comm. Code § 2.719(a)(1) (West 1994), and "it is immaterial whether a limitation of liability is a reasonable estimate of probable damages resulting from a breach." Vallance, 595 S.W.2d at 590. Paragraph 11, by its very terms, limits the damages that may be collected by both parties to $500,000. The parenthetical in paragraph 11 makes clear that BP must still pay for MTBE that is delivered to it by Global and the words "other than" in the parenthetical indicate that payment for delivered product is not to be included in a computation of damages.

Global proposes a definition for "delivered Product" that includes MTBE delivered by Global to third parties on the spot market. As we read it, however, the term "delivered Product" refers to MTBE delivered to BP. For example, paragraph 9 of the Agreement, which governs the risk of loss for MTBE delivered to BP, states that "the Product shall be delivered FOB the Terminal." Global's stretch of the meaning of "delivered Product" to fall within the exception in the parenthetical in paragraph 11 is unconvincing.

Paragraph 4(c) of the Agreement states, in pertinent part:

It is acknowledged and agreed that, except as otherwise expressly provided in this Agreement, the only

> obligations of the Buyer are to accept delivery of, and pay for, delivered Product.

Under this paragraph, BP has two obligations, to accept delivery of MTBE and to pay for delivered Product. The parenthetical in paragraph 11 refers only to BP's obligation to pay for delivered Product. Paragraph 4(c) and 11 are not inconsistent with reading "delivered Product" to refer to MTBE that is delivered to BP. Paragraph 4(c) does not help Global's position.

Nor are paragraphs 4(b)(I) and 4(b)(ii) inconsistent with reading paragraph 11 to cap damages at $500,000. Paragraph 4(b)(I)&(ii) provide formulae for computing BP's or Global's damages for a breach. We are not persuaded that reading paragraph 11 to limit the overall damage recovery to $500,000 renders the damage formulae in paragraph 4(b) superfluous.

3

Global urges that paragraph 11 is not an exclusive remedy under the Agreement, pointing to paragraph 14(c) which provides:

> (c) NO REMEDY EXCLUSIVE. No remedy herein conferred upon or reserved to [BP] or to [Global] under this Agreement is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute.

Global notes that U.C.C. § 2.719(a) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. See Tex. Bus. & Comm. Code § 2.719(a) (West 1994). This argument, however, conflates "remedies" and "damages." Paragraph 11 limits the amount of damages and does not restrict any other remedy, such as injunctive relief, that Global may be entitled to under the

8

Agreement.[1]  U.C.C. § 2.719(a)(2) provides that any remedy is not meant to be exclusive, unless expressly agreed upon by the parties, and this section does not refer to any limitation on the amount of damages.   Indeed, § 2.719(a)(1) explicitly provides that an agreement "may *limit or alter the measure of damages* available under this chapter . . ."  See Tex. Bus. & Comm. Code § 2.719(a)(1) (West 1994) (emphasis added).

4

Global contends that the district court abused its discretion in excluding testimony in oral depositions that BP officials had not read paragraph 11 to limit damages for termination; that this testimony is "course of performance" evidence that should have been considered by the court.

In ignoring this testimony, the district court found that the Agreement was unambiguous and reflected the objective intent of the parties.  In the district court, Global urged that the testimony demonstrated the subjective intentions of BP.  On appeal it shifts, recasting this testimony as "course of performance" evidence. Assuming this testimony is "course of performance" evidence and the shift in position aside, course of performance can only explain or supplement terms of a contract.  See Tex. Bus. & Comm. Code §§ 2.202 & 2.208(b) (West 1994).  It may not be used to contradict the express terms of an unambiguous contract.  Reading the Agreement as a whole, paragraph 11 is unambiguous.  The district court did not

---

[1]  Global has only sought a damage award of $ 28 million and no other relief.

abuse its discretion in not relying on the deposition testimony of BP employees.

5

Global argues for the first time on appeal that even if paragraph 11 of the contract is an exclusive remedy, it "fail[s] of its essential purpose" under U.C.C. § 2.719(b).

> Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title. Sec. 2.719(b).

Paragraph 11 does *not* limit the remedies that Global can seek under the Agreement. It limits the amount of damages that either party can collect. Under Texas law, "contracting parties can limit their liability in damages to a specified amount" and "it is *immaterial* whether a limitation of liability is a reasonable estimate of probable damages resulting from a breach." Vallance, 595 S.W.2d at 590. Moreover, in Texas, an agreement "may *limit or alter the measure of damages* available . . . ." See Tex. Bus. & Comm. Code § 2.719(a)(1) (West 1994).

6

Global urges that in any event the specified damages are disproportionately and unreasonably low under U.C.C. § 2.718.

> U.C.C. § 2.718(a) provides:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

This section, by its terms refers to a liquidated damages provision and not to a limitation on the amount of damages.  As the Eighth Circuit explained, "[a] liquidated damages provision sets a fixed amount that can be recovered upon breach without proof of *any* damage.  A limitation of damages provision limits the damages that may be recovered, but proof of damages is still required in order to recover to the limit."  Tharalson v. Pfizer Genetics, Inc., 728 F.2d 1108, 1111 (8th Cir. 1984) (citing Western Union Tel. Co. v. Nester, 309 U.S. 582, 587-88 (1940)).  Paragraph 11 is a limitation on damages and not a liquidated damages provision.  It is not governed by U.C.C. § 2.718(a).  See id. (concluding that the reasonableness test in U.C.C. § 2.718(a) is inapplicable to a limitation of damages provision).

AFFIRMED.