**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 1 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LEANIN' TREE, INC.,

     Plaintiff - Appellee -
Cross-Appellant,

v.

THIELE TECHNOLOGIES, INC.,
formerly known as Thiele Engineering
Company,

     Defendant - Appellant -
Cross-Appellee.

Nos. 01-1229, 01-1239
(D.C. No. 99-Z-2414)
(D. Colorado)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **LUCERO**, Circuit Judge.

Plaintiff Leanin' Tree, Inc. (Leanin' Tree), filed this diversity action alleging that defendant Thiele Technologies, Inc. (Thiele), breached a commercial contract for the design and manufacture of an automated carton-packing machine. Following a bench trial, the district court found in favor of Leanin' Tree and ordered Thiele to repay Leanin'

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Tree the amounts it had paid pursuant to the contract, as well as part of the consequential damages sought by Leanin' Tree. Thiele appeals, asserting that (1) it was entitled to judgment based upon its defense of commercial impracticability, and (2) in any event, the parties' written agreement precluded Leanin' Tree from recovering consequential damages. Leanin' Tree has filed a cross-appeal challenging the district court's refusal to award all consequential damages sought at trial. We exercise jurisdiction pursuant to § 1291 and affirm.

I.

Leanin' Tree, a Colorado corporation, manufactures, distributes, and sells greeting cards and other miscellaneous gift products. Leanin' Tree has regularly hired seasonal personnel to assist in the process of packaging greeting cards in clear plastic cartons for retail display and sale. In 1995, Leanin' Tree began exploring the possibility of automating its process of packaging cards to save expenses and reduce the necessity of hiring seasonal workers. After exploring various options, Leanin' Tree entered into a written agreement with Thiele in late March or early April 1998 whereby Thiele agreed to design and manufacture a "cartoner" (i.e., an automated carton-packing machine). Thiele specializes in the design and manufacture of cartoning equipment and, at the time of the agreement, had considerable experience in designing and manufacturing equipment that utilized cardboard cartons, but very little experience in designing and manufacturing equipment that utilized plastic cartons, such as those used by Leanin' Tree.

-2-

Prior to entering into the agreement, Leanin' Tree provided Thiele with samples of the plastic cartons it normally used for packaging cards. At no time prior to the agreement did Thiele express concerns about the cartons or its ability to design a machine that could accommodate the cartons. In fact, according to Leanin' Tree, Thiele expressed confidence that it could design and produce such a machine. On September 11, 1998, Thiele wrote to Leanin' Tree setting forth various "specifications concerning the manufacture of [the] cartons." Aplee. App. at 317. The letter stated that if Leanin' Tree's "suppliers w[ould] follow the enclosed specifications, then Thiele w[ould] be able to successfully erect, fill and close the carton." Id.

The parties revised their agreement on several occasions between late 1998 and May 1999 to allow for various design changes (e.g., addition of peripheral equipment). According to the final revised agreement, the machine was to be completed and shipped to Leanin' Tree on June 30, 1999, at a total price of $468,682. Despite the agreed-upon shipping date, and despite its previous assurances to Leanin' Tree that it could design and produce a functioning machine, Thiele was unable to get the cartoner to operate properly. Specifically, the carton set-up portion of the machine, which was designed to take stacks of flat unfolded cartons (essentially individual sheets of shaped and scored plastic) and allow cards to be inserted inside, was not functioning effectively. Thiele did not meet the agreed shipping date and, in July 1999, informed Leanin' Tree of the problems. Although the parties thereafter agreed to modify the design (e.g., by pre-breaking and by double-

scoring the cartons), those modifications did not solve the problem.

In late November or early December 1999, Thiele decided to stop working on the cartoner. Even though the carton set-up portion of the machine was still not functioning properly,[1] Thiele informed Leanin' Tree that, in its opinion, the cartoner was finished and its obligations under the agreement were fulfilled. Thiele further informed Leanin' Tree that any problems with the cartoner were the result of Leanin' Tree's failure to provide an acceptable carton design and were Leanin' Tree's responsibility. At the time of its decision, Thiele's costs in designing and producing the machine were in the neighborhood of $750,000, more than $250,000 above the contract price, and more than $350,000 above Thiele's anticipated costs of design and production.

On December 17, 1999, after sending a representative to observe the cartoner at Thiele's facility (and confirming that the cartoner was not working properly), Leanin' Tree formally rejected the cartoner "based on its failure to conform to the [parties'] agreement." Aplt. App. at 46. On that same date, Leanin' Tree filed this diversity action against Thiele asserting a single claim for breach of contract.

Thiele moved for partial summary judgment, asserting that a clause in the parties' written agreement prohibited Leanin' Tree from recovering consequential damages arising out of the alleged breach of contract. The district court denied Thiele's motion.

---

[1] Because Thiele was unable to get the carton set-up portion of the machine to function properly, it was unable to test the loading and closing features of the machine.

-4-

The case was tried to the district court in February 2001. At the conclusion of the evidence, the district court found in favor of Leanin' Tree on its breach of contract claim. The district court found that, prior to building the cartoner, Thiele had failed to conduct an adequate investigation regarding the plastic cartons used by Leanin' Tree, and had failed to take into account the unique properties of those cartons (as compared to cardboard containers) in designing the cartoner. The district court further found, contrary to Thiele's assertions, that additional changes or modifications to the plastic cartons would not have remedied the problems. After directing the parties to file supplemental pleadings on the issue of damages, the district court awarded Leanin' Tree: (1) $283,669, an amount equal to the payments it had made to Thiele under the written agreement, plus prejudgment interest; and (2) consequential damages in the amount of $146,508.22 (to cover costs incurred by Leanin' Tree on the cartoner project). The district court rejected Leanin' Tree's request for damages to cover the extra labor costs it incurred in 1999 and 2000 for hand-packing its greeting cards.

## II.

### Thiele's Appeal (Case No. 01-1229)

*Commercial impracticability*

Thiele contends the district court erred in concluding that it breached the terms of its written agreement with Leanin' Tree. Thiele asserts that § 4-2-615 of the Colorado Uniform Commercial Code "excuses a seller whose performance has been rendered

impracticable by the failure of a contingency that both parties expected to be satisfied."

Aplt. Br. at 23. According to Thiele, such a contingency occurred here when the manufacturer hired by Leanin' Tree to produce the plastic cartons failed to "supply production cartons equal in quality to the samples it supplied [to Leanin' Tree and Thiele] in August 1998." Id. at 23-24. More specifically, Thiele contends the cartons did not contain score lines running to the ends of the cartons, which made it difficult for the cartoner to erect them properly (Thiele also suggested in the district court that the production cartons were not properly glued). Thiele suggests these carton problems made performance under the agreement impracticable.[2]

Colorado Revised Statute § 4-2-615 provides:

> Except so far as a seller may have assumed a greater obligation and subject to section 4-2-614 on substituted performance:
> (a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) of this section is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency, the nonoccurrence of which was a basic assumption on which the contract was made, or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

_____

[2] Leanin' Tree asserts that Thiele has waived this affirmative defense by failing to raise it timely in the district court. See generally Harriscom Svenska, AB v. Harris Corp., 3 F.3d 576, 580 (2d Cir. 1993) (characterizing defense of "commercial impracticability" under UCC § 2-615 as an affirmative defense). Although it is true that Thiele's answer contained no reference to § 4-2-615, it did state that "Leanin' Tree has not provided Thiele with cartons suitable for operation in the Automatic Cartoner." Aplt. App. at 51. Further, Thiele asserted its § 4-2-615 defense at trial and the district court rejected it on the merits. Accordingly, we assume the defense has not been waived.

(b) Where the causes mentioned in paragraph (a) of this section affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be a delay or nondelivery and, when allocation is required under paragraph (b) of this section, of the estimated quota thus made available for the buyer.

Colo. Rev. Stat. § 4-2-615 (1996). There are no Colorado cases construing § 4-2-615. However, because the statute is derived directly from the Uniform Commercial Code, there are cases from other jurisdictions that provide adequate guidance. "The rationale for the defense of commercial impracticability is that the circumstance causing the breach has rendered performance so vitally different from what was anticipated that the contract cannot be reasonably thought to govern." Waldinger Corp. v. CRS Group Engineers, Inc., 775 F.2d 781, 786 (7th Cir. 1985) (internal quotations omitted). "Because the purpose of a contract is to place the reasonable risk of performance upon the promisor, . . . it is presumed to have agreed to bear any loss occasioned by an event that was foreseeable at the time of contracting." Id.; see also Int'l Minerals & Chem. Corp. v. Llano, Inc., 770 F.2d 879, 886 (10th Cir. 1985) (construing New Mexico's version of UCC § 2-615 in a similar fashion); Parrish v. Stratton Cripple Creek Mining & Dev. Co., 116 F.2d 207, 209-10 (10th Cir. 1940) (applying pre-UCC doctrine of commercial frustration to diversity action governed by Colorado law). Generally speaking, three conditions must be satisfied before a seller's performance under a commercial contract is

excused as commercially impracticable: "(1) a contingency has occurred; (2) the contingency has made performance impracticable; and (3) the nonoccurrence of that contingency was a basic assumption upon which the contract was made." Waldinger, 775 F.2d at 786 (applying Illinois' version of UCC § 2-615). The establishment of each factor is a question of fact, subject to review by this court for clear error. See id. at 788 (describing issue of foreseeability under § 2-615 as a factual issue).

In rejecting Thiele's § 4-2-615 defense, the district court found that neither the second nor third factors had been established by Thiele. More specifically, the district court stated:

> They [Leanin' Tree] were given [carton] specs [by Thiele] which they tried their best to follow; and, indeed, as pointed out by counsel, there were no specifications about full scoring or full gluing . . . and the Court thinks this is a red herring anyway. I don't think the full scoring and the full gluing would have made this machine work. I think [Leanin' Tree's expert witness] Mr. Luciano has it right that it takes a lot more than that. You would have to have this overbreak with the pressure on them to work.

Aplt. App. at 112-13.

> Well, as far as Leanin' Tree was concerned, there wasn't any contingency. They had been using these plastic cartons for years, hand-packing them. They were willing to do whatever Thiele wanted them to do, but they certainly weren't told about scoring to the very edge or gluing to the very edge as a spec that they had to meet in order to make this work as a contingency. And, indeed, that didn't come in till later. And, indeed, the Court is convinced that that wouldn't have made any difference in making this machine work.

Id. at 113-14.

[The scoring and gluing specifications] certainly should have been within

the contemplation of the expert in the machinery, Thiele. Leanin' Tree didn't even think about whether you needed scoring all the way or gluing all the way and really didn't have to. They weren't experts in cartoning machinery or in the requirements for what it needed, what was needed to erect or fill or close these.

Id. at 114.

So 615 really doesn't help the defendant. Thiele knew that they had to try to make a machine to work with the cartons of Leanin' Tree. They did not do the investigation, the homework, that they should have done before entering into this contract. Probably making the scores up to the edge may very well result in tearing, which is not going to make these cartons work. As Mr. Luciano indicated, making the scores better or making the glue better may not be possible, and Thiele should have found out about these problems at the very beginning.

Id. at 115.

The district court's findings are not, in our view, clearly erroneous. Leanin' Tree's expert witness, consulting engineer Robert Luciano, opined that the alleged carton scoring problems pointed to by Thiele as a contingency could not have been corrected by the carton manufacturer and, even if capable of correction, would not have resulted in the cartoner working properly. Instead, Luciano opined, the plastic cartons needed a 180-degree "overbreak" to allow them to work properly in the cartoner. Leanin' Tree also presented the testimony of Greg Fulkerson, Thiele's director of applications engineering, who admitted that: (a) the sample cartons provided by Leanin' Tree were not run through any test machines, but instead were examined by hand by Thiele personnel and deemed to be "machineable"; (b) Thiele had no significant experience in designing and manufacturing machines that worked with plastic cartons, and had little understanding of

the unique properties of plastic (as compared to the cardboard cartons with which it typically worked) when it agreed on an initial carton design and confirmed machinability; (c) prior to actual production of the cartoner, Thiele did not direct Leanin' Tree to have the cartons scored or glued to any specific lengths; and (d) by producing the cartoner without successful pre-production tests, and without an adequate understanding of plastics, Thiele severely limited the options available for making the machine work (effectively limiting the available options to changing the cartons themselves). In light of this testimony, we conclude the district court's rulings were well within the evidence when it found that the alleged problems with the cartons did not render Thiele's performance under the agreement impracticable, the parties' agreement contained no basic assumptions regarding the design of the cartons, and Thiele should have foreseen the carton problems identified.

*Contract provision - exclusion of consequential damages*

Thiele contends that even if its defense of commercial impracticability is rejected, the district court's judgment awarding consequential damages must be reversed because, under the terms of the parties' written agreement, Leanin' Tree was precluded from recovering consequential damages. Because Thiele's contention requires us to interpret the parties' written agreement, we review the issue de novo. See Bank of Okla. v. Muscogee (Creek) Nation, 972 F.2d 1166, 1171 (10th Cir. 1992); Ad Two, Inc. v. City & County of Denver, 9 P.3d 373, 376 (Colo. 2000); see also Salve Regina College v.

Russell, 499 U.S. 225, 231 (1991) (holding that issues governed by state law are reviewed de novo by appellate court); Key Youth Servs., Inc. v. City of Olathe, 248 F.3d 1267, 1274 (10th Cir. 2001) (holding that, on appeal from a bench trial, this court reviews the district court's conclusions of law de novo).

In Ad Two, the Colorado Supreme Court outlined the general principles of contract interpretation that we must apply to resolve the issue:

> The primary goal of contract interpretation is to determine and give effect to the intent of the parties. The intent of the parties to a contract is to be determined primarily from the language of the instrument itself. In ascertaining whether certain provisions of an agreement are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed. Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language. Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract.
>
> Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation. Absent such ambiguity, we will not look beyond the four corners of the agreement to determine the meaning intended by the parties. The mere fact that the parties may have different opinions regarding the interpretation of the contract does not itself create an ambiguity in the contract.

9 P.3d at 376-77 (internal citations omitted).

Thiele argues the terms of the parties' contract limited its exposure to damage liability. Thiele points to language contained in a form entitled "THIELE ENGINEERING COMPANY STANDARD CONDITIONS OF SALE" (standard conditions of sale) that was attached to the parties' written agreement. Aplt. App. at 36. The relevant paragraph of the form, Paragraph 4 entitled "Limitation of Liability,"

-11-

provides as follows:

> The equipment being sold by Seller to Buyer is complex equipment. Seller has advised Buyer the equipment requires trained maintenance, upkeep and monitoring by trained members of Buyer's staff during operation. Buyer has been advised by Seller that the equipment should not be used in production until Buyer, in its sole discretion, determines that the equipment, product and Buyer's staff are ready. Buyer, as a sophisticated entity, has understood and accepts Seller's advisory. Seller has priced the equipment upon the understanding that Seller will not be responsible or liable for any form of consequential, incidental, or indirect damages of whatever kind or type arising from any type of commercial, business, environmental, tort, warranty, contract, strict liability, or other cause(s) arising, directly or indirectly, from or in connection with the equipment and/or its use. Not by way of limitation, Seller shall not be liable for any losses to Buyer based on down time, spoilage, lost production or lost profits. It is the intention of the parties that this provision be construed by a court as being the broadest limitation of liability consistent with applicable law. In [no] event shall Seller be liable for damages which exceed the monies paid by Buyer to Seller for the equipment less the value of the benefits received by Buyer and the value of the equipment.

Id. at 36. In ruling on Thiele's motion for partial summary judgment, the district court concluded this provision did not limit Leanin' Tree's ability to recover consequential damages from Thiele under the circumstances presented. The court noted that the sentence purporting to limit Thiele's liability for consequential damages was placed immediately after the opening language of the provision discussing the complexity of the equipment and advising Leanin' Tree that the equipment was to be used by trained personnel. The district court concluded that, "[i]n the context of the paragraph, Seller [Thiele] appears to be seeking protection from liability for any problems that could arise in connection with the equipment once Buyer [Leanin' Tree] possesses and/or uses it."

-12-

Aplt. App. at 68. The court therefore agreed with Leanin' Tree "that the language 'arising, directly or indirectly, from or in connection with the equipment and/or its use' [could not] apply to situations where there [wa]s no equipment in the buyer's possession." Id. at 68-69.

We agree with the district court's interpretation. As noted by the district court, and undisputed by the parties, the equipment at issue was never delivered to Leanin' Tree. Although much of the key sentence is worded broadly (e.g., referring to "any type of commercial, business, environmental, tort, warranty, contract, strict liability, or other cause(s)"), the final clause of the sentence ("arising, directly or indirectly, from or in connection with the equipment and/or its use"), in our view, is limited to occurrences that might arise after the buyer (Leanin' Tree) takes possession of a functioning machine from the seller (Thiele). In other words, the sentence at issue, particularly when construed in light of the "Limitation of Liability" provision as a whole, operates on the assumption that a functioning machine either has been or will be delivered by the seller (Thiele) to the buyer (Leanin' Tree), and focuses on the types of liability and damages that might arise thereafter. See generally Bd. of County Comm'rs of Adams County v. City & County of Denver, 40 P.3d 25, 35 (Colo. Ct. App. 2001) ("Words and phrases should be interpreted by examining the contract as a whole."); Hallmark Bldg. Co. v. Westland Meadows Owners Ass'n, 983 P.2d 170, 172 (Colo. Ct. App. 1999) ("In determining whether provisions of a document are ambiguous, its language must be construed in harmony with

-13-

the plain, ordinary and commonly accepted meaning of the words employed and reference must be made to all provisions of the document. ").

Our conclusion is bolstered by examining the remainder of the standard conditions of sale document, as well as the entire written agreement to which the standard conditions of sale document was attached. Paragraph 3 of the standard conditions of sale, entitled "Seller's Warranty," purports to limit Leanin' Tree's remedies to having defects in the cartoner repaired or defective parts replaced. Aplt. App. at 36 ("No claim by Buyer for damages, labor and installation charges will be allowed."). That remedy, however, expressly applies only after "the date of shipment by Seller." Id. As for the parties' written agreement, the opening paragraph entitled "Project Overview" states that the cartoner to be manufactured by Thiele "will function as part of a larger system to manufacture and package greeting cards." Aplt. App. at 20. Numerous other paragraphs of the agreement outline, in detail, how the cartoner will operate (e.g., operating speed, carton set-up, product loading, carton closure, carton discharge). The agreement further provides that the cartoner "will be tested at Thiele's assembly plant prior to shipment to the customer's facility," and "all capabilities of the machinery will be demonstrated." Id. at 31. Lastly, the agreement outlines how the cartoner will be shipped from Thiele to Leanin' Tree and how the cartoner is to be installed by Leanin' Tree at its facility. Id. In sum, both the standard conditions of sale and the parties' agreement assume delivery of a properly functioning machine to Leanin' Tree.

In a fall-back argument, Thiele asserts that the last sentence of Paragraph 4 of the standard conditions of sale, which provides that "[i]n [no] event shall Seller be liable for damages which exceed the monies paid by Buyer to Seller for the equipment less the value of the benefits received by Buyer and the value of the equipment," independently operates to limit its liability to the amount of the purchase price.[3] Although the sentence might, if construed in isolation, produce the result desired by Thiele, Colorado law requires it to be construed in light of Paragraph 4 and the agreement as a whole. See Rogers v. Westerman Farm Co., 29 P.3d 887, 898 (Colo. 2001) ("in contract law . . . language should be construed as a whole, and specific phrases or terms should not be interpreted in isolation"); Town of Silverton v. Phoenix Heat Source Sys., Inc., 948 P.2d 9, 11 (Colo. Ct. App. 1997) ("The meaning of a contract is found by examining the entire instrument, not by viewing clauses or phrases in isolation."). In our view, this is particularly appropriate since the opening phrase of the sentence, "In no event," appears to relate to the preceding sentences of the paragraph. Applying such a construction, we conclude that Paragraph 4 is focused on limiting Thiele's liability for situations arising after delivery of a functioning machine. Because that never occurred here, the damage

---

[3] It is unclear from the record whether the argument was raised by Thiele in the district court. Although Thiele's appendix includes a copy of its actual motion for partial summary judgment (on the issue of consequential damages), it does not include a copy of the supporting memorandum. Nor does the appendix include a copy of Leanin' Tree's response to Thiele's motion. The district court's order, although contained in the appendix, makes no mention of the issue.

limitations do not apply.

For these reasons, we agree with the district court that the parties' written agreement did not prohibit Leanin' Tree from obtaining consequential damages arising out of Thiele's failure to deliver a functioning cartoner.[4]

### Leanin' Tree's Cross-Appeal (Case No. 01-1239)[5]

In its cross-appeal, Leanin' Tree contends the district court erred in refusing to award it consequential damages for the extra costs it incurred ($124,000) in hand-packing Christmas cards in the late summer and fall of 1999 and 2000.[6] The district court concluded that such an award "would amount to a double recovery for Leanin' Tree," since it "would have had to carton its Christmas cards by hand, as it had in the years prior to its contract with Thiele, if it had never ordered a cartoner." Aplt. App. at 124. According to Leanin' Tree, these damages were allowable under Colo. Rev. Stat. § 4-2-

---

[4] Having reached this conclusion, we find it unnecessary to address Leanin' Tree's assertion that the agreement's limited remedy of repair or replacement failed its essential purpose.

[5] This section represents only the opinion of Judge Briscoe. As noted in Judge Lucero's concurring opinion, since there is no consensus among the panel regarding he cross-appeal, the judgment of the district court is affirmed in all respects.

[6] In arriving at the $124,000 figure, Leanin' Tree calculated its total labor costs for hand-packing in 1999 and 2000 and deducted the costs and expenses it would have incurred if Thiele had delivered a working cartoner. For example, for the year 2000, Leanin' Tree expended $169,000 in labor costs for hand-packing. From this amount, they deducted "[t]he depreciation expense and the personal property taxes" that would have been associated with the cartoner had it been delivered in working order and arrived at a figure of approximately $64,000 in "additional expense" incurred "in the year 2000" as a result of not having a working cartoner. App. at 144.

711 as the direct result of Thiele's non-delivery of the cartoner. Leanin' Tree further argues there would be no double recovery because, if it "'covers' by buying another automatic cartoner . . . , receives its deposit back and recovers the additional labor costs for 1999 and 2000, [it] is in the same position it would have been had the contract been performed." Aplee. Br. at 37. Because this is a mixed question that appears to primarily involve the consideration of legal principles under Colorado's UCC, it is reviewed by this court de novo. See Naimie v. Cytozyme Lab., Inc., 174 F.3d 1104, 1111 (10th Cir. 1999).

Under Colorado law, "[d]amages are awarded in order to make the non-breaching party whole." Colorado Interstate Gas Co. v. Chemco, Inc., 833 P.2d 786, 791 (Colo. Ct. App. 1991). "The general measure of damages for a contract case [under the Colorado UCC] is that amount which places the non-defaulting party in the same position he would have been in had the breach not occurred." Id.; see also Colo. Rev. Stat. § 4-1-106(1) ("The remedies provided by this title shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed.").

The question posed by Leanin' Tree directly implicates three sections of Colorado's version of the Uniform Commercial Code. The first, § 4-2-711, provides:

> (1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance, then, with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract . . . , the buyer may cancel, and whether or not he has done so, may in addition to recovering so much of the price as has been paid:
> * * *

(b) Recover damages for nondelivery as provided in this article (section 4-2-713).

Colo. Rev. Stat. § 4-2-711 (1996).  The second section, expressly referenced in the first, is § 4-2-713.  That section, entitled "Buyer's damages for nondelivery or repudiation," provides:

[T]he measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (section 4-2-715), but less expenses saved in consequence of the seller's breach.

Colo. Rev. Stat. § 4-2-713(1) (1996).  The final section, expressly referenced in the second, is § 4-2-715.  That section, entitled "Buyer's incidental and consequential damages," provides:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting "cover" and any other reasonable expense incident to the delay or other breach.
(2) Consequential damages resulting from the seller's breach include:
(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
(b) Injury to person or property proximately resulting from any breach of warranty.

Colo. Rev. Stat. § 4-2-715 (1996).  "Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach."

Id. Comment 2.  "[T]he seller is liable for consequential damages in all cases where he

had reason to know of the buyer's general or particular requirements at the time of contracting." Id. Comment 3.

Applying these sections to the circumstances at issue, I conclude that the extra labor costs incurred by Leanin' Tree readily fall within the category of "consequential damages" allowable under §§ 711, 713, and 715 for Thiele's nondelivery of the cartoner. Thiele does not dispute that, at the time the parties entered into their agreement, it knew Leanin' Tree was purchasing the cartoner to automate its card-packaging operations and reduce the necessity of hiring seasonal labor. When Thiele failed to deliver a functioning machine as promised, Leanin' Tree was unable to cover (i.e., by purchasing a cartoner from another manufacturer), and was forced to hire seasonal labor to perform the intended task. Thus, the extra labor costs expended by Leanin' Tree (i.e., the difference between the cost of the seasonal labor and the costs Leanin' Tree would have expended if Thiele had provided a functioning cartoner), which were entirely foreseeable to Thiele, fall readily within the scope of consequential damages as defined in § 4-2-715(2)(a). E.g. Plastic Moldings Corp. v. Park Sherman Co., 606 F.2d 117, 119 (6th Cir. 1979) (affirming award of consequential damages "for increased production costs caused when [the buyer] was forced to use hand labor to assemble the usable parts rather than machines"); Carl Beasley Ford, Inc. v. Burroughs Corp., 361 F. Supp. 325, 328, 335 (E.D.Pa. 1973) (allowing buyer to recover consequential damages for overtime pay and expenses incurred in hiring accountants to reconstruct accounting records where computer

equipment and accounting software failed to perform properly), aff'd, 493 F.2d 1400 (3d Cir. 1974); General Elec. Capital Corp. v. Rauch, 970 S.W.2d 348, 358 (Mo. Ct. App. 1998) (affirming award of consequential damages to buyer under Missouri's version of UCC § 2-715 for "labor expenses [that] allowed Buyer to output a finished product as originally contemplated by the parties"); Antz v. GAF Materials Corp., 719 A.2d 758, 761 (Pa. Super. Ct. 1998) ("Consequential damages can include replacement labor costs."); Cricket Alley Corp. v. Data Terminal Sys., Inc., 732 P.2d 719, 725 (Kan. 1987) (concluding that, where computerized cash registers failed to perform with other computerized equipment as warranted, consequential damages could include increased labor costs).

Although Thiele complains that awarding such damages to Leanin' Tree places it in a better position than it would have been if it had taken delivery of a functional machine, I disagree. As noted by Leanin' Tree, it is still without a cartoner and must rely on hand-packing (and the extra labor costs associated with that process) until it can obtain a cartoner. Thus, all of the refunded purchase price (and perhaps more) will be required to purchase a new cartoner. Moreover, as pointed out by Leanin' Tree, if it is not awarded damages for the extra labor costs incurred in 1999 and 2000, it will not be placed in the same position as if the breach had not occurred. Instead, it will be placed in the position that it held prior to entering into the contract.

For these reasons, I would remand to the district court with directions to award

Leanin' Tree an additional $124,000 in consequential damages.

## III.

The judgment of the district court is AFFIRMED in all respects.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

Nos. 01-1229 & 01-1239, <u>Leanin' Tree, Inc. v. Thiele Technologies, Inc.</u>

**LUCERO,** Circuit Judge, concurring.

I agree with the opinion of my colleague Judge Briscoe in all regards save one—her view that this case should be remanded with directions to award additional consequential damages to Leanin' Tree. Upon the facts of this case, and limiting my concurrence to the facts of this case, it is my considered opinion that on the issue of consequential damages the district court's disposition was correct. <u>See</u> Colo. Rev. Stat. § 4-2-715 cmt. 4 ("Loss may be determined in any manner which is reasonable under the circumstances."); <u>Eccher v. Small Bus. Admin.</u>, 643 F.2d 1388, 1391–92 (10th Cir. 1981) ("We will not disturb the district court's determination of damages unless clearly erroneous."); <u>see also</u> Fed. R. Civ. P. 52(a). Reviewing the record before us, I cannot say that the district court's grant of some consequential damages, and rejection of others, is unreasonable under the circumstances and thus clearly erroneous. For that reason I would affirm the district court.

I note that because there is a lack of a majority supporting remand, the judgment of the trial court is affirmed in all respects.

Nos. 01-1229 & 01-1239 – Leanin' Tree, Inc. v. Thiele Technologies, Inc.

**BRORBY,** Senior Circuit Judge, dissenting.


I respectfully dissent.


I agree with the majority's well reasoned argument rejecting Thiele's commercial impracticability defense. However, I disagree with the majority's reading of the contract. Because I would limit Leanin' Tree's recovery to the purchase price of the equipment, in my view, the cross-appeal seeking damages for labor costs is moot.


Initially, I agree the contract language that purports to eliminate "any form of consequential ... damages" may reasonably be interpreted to contemplate only situations arising after delivery of the equipment. When applying Colorado law, we strictly construe contractual ambiguity against the drafter – in this case, Thiele. *United States Fidel. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 211 (Colo. 1992) (en banc). Therefore, I agree Thiele has not successfully limited all liability prior to delivery of the equipment.


Nevertheless, I cannot agree with the majority's reading of the purchase price damage cap found in the last sentence of paragraph four. In my view, the

contextual arguments relied upon by the majority are not sufficient to override the unambiguous language "[i]n no[] event shall Seller be liable for damages which exceed the monies paid by Buyer to Seller."  Courts resolving Uniform Commercial Code disputes between sophisticated parties have consistently enforced damage caps preceded with the language "in no event."  *See, e.g., Computrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1070-71 (8th Cir. 2000) (holding contract which stated liability "shall *in no event* exceed the amounts actually paid" was unambiguous and enforceable) (emphasis added); *Global Octanes Texas, L.P. v. BP Exploration & Oil Inc.*, 154 F.3d 518, 521-23 (5th Cir. 1998) (enforcing contractual damage cap which read "*[i]n no event* shall the liability of either party under this Agreement ... exceed $500,000" (emphasis added)).

In this case, the majority asserts the clause "'[i]n no event,' appears to relate to the preceding sentences of the paragraph," and therefore "is focused on limiting Thiele's liability for situations arising after delivery."  According to the majority, both the broader limitation of all direct and indirect damages as well as the purchase price damage cap apply only after delivery of the equipment.  This reading appears to make the damage cap irrelevant, since if the equipment were delivered, no damages would have been available anyway.  However ambiguous

the contract may be, it certainly does not permit a reading where there are no circumstances in which liability could be limited to the purchase price. I do not dispute the contract assumes the equipment will at some point be delivered. It would be a strange equipment sales contract which did not provide for delivery. What I cannot follow is the logical leap from this assumption to the conclusion the contractual damage cap is only operative after delivery. Even if the "in no[] event" clause "relates" to the preceding sentences, I believe it is sufficiently broad to cap Thiele's pre-delivery liability to the purchase price of the equipment. The majority's reading of the contract comes perilously close to inserting the phrase "except for non-delivery of the equipment" after the words "in no event."

For these reasons I would reverse and remand on the question of damages.